**James N. LEWIS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 82–1522.

District of Columbia Court of Appeals.

Argued Oct. 18, 1983.

Decided Oct. 2, 1984.

Terence McCourt, Washington, D.C., appointed by the court, with whom Stephen R. Lohman, Washington, D.C., was on the briefs, for appellant.

Terence J. Keeney, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the briefs were filed, and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the briefs, for appellee.

Before NEBEKER and BELSON, Associate Judges, and KERN,* Associate Judge, Retired.

BELSON, Associate Judge:

Appellant was convicted of manslaughter while armed, D.C.Code §§ 22–2405, –3202 (1981 & Supp.1983), in connection with the stabbing death of his nephew, Bernard Lee. We hold that a statement given to police shortly after appellant's arrest should have been suppressed because appellant was not advised of all of his *Miranda* rights.[1]

However, we further hold that the error was harmless beyond a reasonable doubt because the substance of the erroneously-admitted statement was presented to the jury through other, untainted, testimony. We therefore affirm the conviction.

The incident leading to appellant's arrest occurred in the early morning hours of February 27, 1981. At about 2 a.m., appellant and other members of his household were awakened by a disturbance at the front door. Bernard Lee, appellant's nephew who had been living in appellant's home for the past few months, was knocking at the door and hollering that he wanted to come in to get his clothes. After some delay, appellant got out of bed, picked up a knife from a nearby table and went downstairs. He then opened the door and confronted Lee. In the course of the ensuing encounter Lee received a stab wound that later proved fatal.

Although wounded, Lee left. Appellant went back upstairs and told Maxine Clark, the woman with whom he was living, that he had stabbed Lee. Appellant then went to the home of a friend, Thomasina Ingram.

In the meantime, Lee had been taken to the hospital and the police had been called. Detective Thomas Arnold testified at a pretrial suppression hearing that as a result of his investigation that morning, he suspected appellant was the person who had stabbed Lee. When he went to appellant's home, appellant was not there. Terrance Lewis, another nephew, called appellant at Thomasina Ingram's and told him to come home right away because there was "trouble."

When appellant arrived back home, Detective Arnold arrested him and took him out to a police car. There Arnold advised appellant from memory of his *Miranda* rights. Appellant indicated he understood his rights. Arnold then told appellant that

---

* Judge Kern was an Associate Judge of the court at the time of argument. His status changed to Associate. Judge, Retired, on May 25, 1984.

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the police were aware he had had a problem earlier with Lee, that they had heard one side of the story and that they would like to hear his side. Appellant assented and, still sitting in the police cruiser, told Arnold his version of the incident. For convenience, we refer to these remarks as appellant's first statement.

Appellant was then taken to police headquarters. In Detective Arnold's office, appellant was again advised of his *Miranda* rights. This time, however, Arnold read him the rights from a printed card. Appellant indicated on the card that he did not wish to answer any questions. Nevertheless, while Arnold was filling out the arrest paperwork, appellant made a comment about the stabbing incident. Although again warned by Arnold that anything he said could be used against him, appellant made several other remarks. These remarks at the police station we refer to as appellant's second statement.

At the suppression hearing, the trial court ruled both statements admissible. As to the first, the court found that appellant had been advised of his rights and that he had made a knowing and intelligent waiver of those rights. As to the second statement, the court found that appellant's remarks were voluntary since they were made "without any questioning or prompting by the detective" and were not the product of coercion or duress.

At trial, the government produced nine witnesses. One of these was Detective Arnold, who related the substance of appellant's two statements. Appellant took the stand in his own behalf and also proffered one witness who testified to Lee's poor reputation in the community for peace and good order. The jury acquitted appellant of second-degree murder but found him guilty of manslaughter while armed. On this appeal, appellant claims the trial court erred in admitting into evidence his two

statements to Detective Arnold. He complains that he was not given adequate *Miranda* warnings before the first statement and that he did not knowingly and intelligently waive his rights before either the first or the second statement.[2]

**I**

The government and appellant agree that since appellant was clearly under arrest when he gave his first statement, the detective's questioning constituted custodial interrogation, and the constitutional prescriptions of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), therefore applied. Appellant argues that since Arnold did not advise him that an attorney would be appointed for him if he could not afford one, the trial court erred in not suppressing the subsequent statement made in the police cruiser.

█ We have no doubt that if Detective Arnold failed to advise appellant of his right to court-appointed counsel, it was error to admit the first statement at trial. The *Miranda* decision itself made clear that unless an accused is informed of all of the mandated rights, "no evidence obtained as a result of interrogation can be used against him." 384 U.S. at 479, 86 S.Ct. at 1630. *See also Clark v. Smith*, 403 U.S. 946, 91 S.Ct. 2279, 29 L.Ed.2d 859 (1971), *rev'g* 224 Ga. 766, 164 S.E.2d 790 (1968) (conviction summarily reversed where accused had been informed of all *Miranda* rights except the right to court-appointed lawyer in case of indigency); *Moore v. United States*, 457 A.2d 406, 409 (D.C. 1983) ("anything less" than informing an accused of "the entire litany of [*Miranda*] rights ... will render a subsequent statement inadmissible at trial during the government's case-in-chief").

---

**2.** Appellant also argues that admission of evidence of two prior convictions constituted reversible error. This contention is without merit in view of the nature and dates of the convictions. *See* D.C.Code § 14–305(b)(1)(B), (b)(2)(B)(ii) (1981); *Bates v. United States*, 403 A.2d 1159, 1161 (D.C.1979); *Dixon v. United States*, 287 A.2d 89, 100 (D.C.), *cert. denied*, 407 U.S. 926, 92 S.Ct. 2474, 32 L.Ed.2d 813 (1972).

The government does not contest this principle. Rather, it argues that there was substantial evidence presented at the suppression hearing to support the trial court's finding that appellant was adequately advised of his rights before he made his first statement. We disagree.

The government concedes that Detective Arnold did not testify "that he had specifically advised [appellant] that if he could not afford a lawyer one would be appointed for him." It contends, nevertheless, that Arnold "testified that the warnings he had given were almost verbatim" from the printed "PD 47" card used by D.C. police to inform suspects of their rights. The transcript does not support this reading of the testimony, however. At the suppression hearing the prosecutor directly asked the detective, "What rights did you advise him of?" Arnold replied,

> I told him that he had the right to remain silent, that anything he said could be— can and will be used against—can and would be used against him in court, and that he had the right to an attorney, to have the attorney present during questioning.

As is evident, this recitation includes no reference to the accused's right to have a lawyer appointed by the court if he cannot afford one.

After a few more questions, Detective Arnold admitted that at the time of the arrest he did not have a PD 47 with him, thus implying that he had relied on his memory to inform appellant of his rights.

The prosecutor then asked, "And you did advise him of his rights almost verbatim from a PD 47?" Arnold answered, "Pretty much so, I think."

■ This equivocal answer to the prosecutor's leading question cannot support a finding that Arnold advised appellant of the "entire litany" of *Miranda* rights, *see Moore, supra,* 457 A.2d at 409, especially in the face of Arnold's previous unambiguous recitation of the other rights of which he did inform appellant. Accordingly, we hold that, based on the evidence presented at the suppression hearing, the trial court's finding that appellant was adequately advised of his rights is "plainly wrong [and] without evidence to support it." D.C.Code § 17-305(a) (1981); *see Moore, supra,* 457 A.2d at 408.

The government argues that even, if the record raises some doubt as to the adequacy of the *Miranda* warnings, appellant is entitled at most to a remand for further inquiry because of his failure to focus the attention of the court on the asserted omission. The government notes that at the suppression hearing appellant never took the stand to testify that the warnings were inadequate, and his counsel never asked Arnold if he had advised appellant of any rights other than those specified and never argued to the court that the warnings were inadequate.[3]

■ The government's argument overlooks the fact that the Supreme Court in *Miranda* held that where a challenge is

---

3. Although the government points out that "[t]he entire issue of an incomplete advice of rights is raised for the first time on appeal," it does not assert that appellant is precluded from raising this issue on appeal or that this court's review is limited to "plain error" analysis. *See* Super.Ct.Crim.R. 52(b). Nor could the government prevail on such an argument. The circumstances of this case are distinguishable from the typical plain error situation since appellant here did object to the admission of the allegedly impermissible evidence. He filed a motion to suppress in which he asserted that he did not understand he was waiving his *Miranda* rights and that "[a]ssuming, without conceding, that [he] was properly advised of his *Miranda*

rights," the statements nevertheless had to be suppressed because they were not made voluntarily.

Although these assertions are rather general, we think they sufficiently alleged an inadequacy in the *Miranda* warnings. Where the record shows that a defendant has at least attempted to challenge the sufficiency of the *Miranda* warnings, this court will regard the issue as having been raised. *See Botts v. United States,* 310 A.2d 237, 243 (D.C.1973); *Brown v. United States,* 282 A.2d 571, 574 (D.C.1971); *United States v. Christian,* 571 F.2d 64, 68 (1st Cir.1978). Moreover, the hearing transcript reveals that the prosecutor and the trial judge were both aware that the completeness of the warnings was at issue.

made to the introduction of a defendant's statement, the burden is on the government to show that the warnings have been given: "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [the defendant]." 384 U.S. at 479, 86 S.Ct. at 1630. Thus, in this case, when Detective Arnold failed to mention the right to court-appointed counsel, the burden was on the prosecutor to clarify the testimony. The prosecutor attempted to do so, but was unsuccessful. Moreover, when questioned at trial about what he had advised appellant, Arnold gave a response virtually identical to that at the suppression hearing. He enumerated the first three of the *Miranda* warnings but made no mention of the right to court-appointed counsel.

◼ In light of the above, we think it would be inappropriate to remand for further testimony on the *Miranda* warnings. The detective twice gave the same answer as to what warnings he had delivered. The government had a full opportunity to develop the facts concerning the giving of *Miranda* warnings, and did so.

Because we conclude that appellant's first statement should have been suppressed owing to the inadequacy of the *Miranda* warnings, we do not address appellant's alternative argument that he did not make a knowing and intelligent waiver of his rights before giving this first statement.

## II

We turn now to the second statement. At the police station, Detective Arnold read appellant his *Miranda* rights from a PD 47 card. Appellant signed the card and indicated on it that he did not wish to answer any questions and that he was not willing to talk to police without an attorney

present. In view of those responses, Detective Arnold did not attempt to interrogate appellant; instead, he began typing up the arrest paperwork. As Arnold was doing that, appellant made the comment, "I didn't think I cut him that bad." Arnold testified that this statement was not in response to any question. Rather "[i]t was made in such a manner as it doesn't appear like it was directed to me or anyone else. It was just sort of a thinking out loud statement." The detective again reminded appellant that anything he said could be used against him, but appellant continued to make other remarks about the incident with Lee.

◼ The trial court found that this statement was voluntary and not the product of any interrogation, coercion, or duress. We think the evidence cited above supports this finding. *See* D.C.Code § 17–305(a), *supra.* Since the Supreme Court in *Miranda* held that "[v]olunteered statements of any kind are not barred by the Fifth Amendment," 384 U.S. at 478, 86 S.Ct. at 1630,[4] the trial court's decision to admit the second statement would have been correct if its previous ruling that the first statement was admissible had been correct. However, in view of our above holding that the first statement was inadmissible, a question arises as to whether the second statement should also have been excluded as the "fruit of the poisonous tree." *See Boykins v. United States,* 366 A.2d 133, 136 (D.C. 1976); *Ruffin v. United States,* 293 A.2d 477, 479–80 (D.C.1972) (adopting view of Justice Harlan's statement concurring in part and dissenting in part in *Darwin v. Connecticut,* 391 U.S. 346, 350–51, 88 S.Ct. 1488, 1490–91, 20 L.Ed.2d 630 (1968)). The parties have not briefed this question, however, and we need not address it since we conclude that any error in admitting this statement, as well as the error in admitting the first statement, was harmless.

---

4. *See also Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981) (once an accused asserts his right to counsel, he is not subject to further interrogation without counsel "unless the accused himself initiates further communication, exchanges, or conversations with the police"); *Hawkins v. United States,* 461 A.2d 1025 (D.C.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 734, 79 L.Ed.2d 193 (1984).

### III

In *Moore, supra,* 457 A.2d at 409 n. 6, this court left open the question whether an error in admitting a statement obtained in violation of *Miranda* can be viewed as harmless under the standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We hold here that, at least where the statement was voluntary, a conviction should not be reversed for such error if the *Chapman* harmless constitutional error standard is met.[5]

In *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), the Supreme Court found "harmless beyond a reasonable doubt" the admission of a confession which the Court assumed for the sake of argument had been obtained in violation of the defendant's Sixth Amendment rights as interpreted in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). A police officer posing as a prisoner had elicited from the defendant a confession to first-degree murder. A majority of the Supreme Court assumed without discussion that harmless error analysis was proper in that situation. The four dissenting justices did not quarrel with that assumption, but maintained instead that the error was not harmless.

Two subsequent Supreme Court decisions suggested that harmless error analysis may not be applied in situations where a confession was truly involuntary. In *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978), the Court said that *"any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law 'even though there is ample evidence aside from the confession to support the conviction.' " (Quoting *Jackson v. Denno,* 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964) (em-

phasis in original)). In *Mincey* the defendant's statement was obtained during 4 hours of questioning of a "seriously and painfully wounded man on the edge of consciousness." *Mincey, supra,* 437 U.S. at 401, 98 S.Ct. at 2418. The defendant, who was in a hospital intensive-care unit, had been drugged and had tubes in his nose and throat. Moreover, the police had ignored repeated requests by the defendant that questioning cease until he could get a lawyer.

Likewise, the Supreme Court held in *New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), that no use could be made of "compelled statements, as opposed to statements taken in violation of *Miranda."* *Id.* at 459, 99 S.Ct. at 1297. There, however, the testimony that the state sought to use for impeachment purposes had been obtained in response to a grant of legislative immunity. Such testimony, the Court said, was "the essence of coerced testimony" and involved "the constitutional privileges against compulsory self-incrimination in its most pristine form." *Id.* Compare *Mincey and Portash* with *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (statement taken after inadequate *Miranda* warnings, but not coerced or involuntary, may be admitted to impeach defendant), and *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) (statement taken after defendant had asked to talk to lawyer, but not coerced or involuntary, may be admitted to impeach defendant).

Turning to situations in which statements have been obtained, not by coercion but, nevertheless, in violation of *Miranda's* prophylactic rules, we find that numerous federal circuit court opinions have applied

---

5. Our holding here is consistent with two other opinions of this court in which we employed the harmless error standard in a *Miranda* context but did not engage in extensive discussion of the issue. In *Montgomery v. United States,* 268 A.2d 271, 272–73 (D.C.1970), our primary holding was that the statement was not the product of custodial interrogation and thus its admission did not violate *Miranda.* Our application of the

harmless error doctrine provided an alternative basis for affirmance. Recently, in *Miley v. United States,* 477 A.2d 720 (D.C.1984), we held that although the defendant's statement should have been suppressed because of the lack of *Miranda* warnings, the error was harmless beyond a reasonable doubt. There was no contention in *Miley* that the statement was coerced or otherwise involuntary.

*Chapman* harmless error analysis. In *United States v. Baldwin*, 691 F.2d 718, 723–24 (5th Cir.1982), for example, the court declared, "It is now settled that in appropriate cases, violations of *Miranda's* teachings may fall within the purview of the harmless error rubric" (citing *Harryman v. Estelle*, 616 F.2d 870 (5th Cir.) (en banc), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980)).[6]

■ In this case, the error in admitting appellant's first statement lay in Detective Arnold's failure to advise appellant of his right to court-appointed counsel. There is no suggestion that the statement was involuntary or coerced by "third degree" tactics. Thus, in light of the precedents discussed above, we hold that the erroneous admission of this statement is susceptible to harmless error analysis.[7] As to the admission of appellant's second statement, the error, if any, arose from the same violation of the *Miranda* rules. The trial court explicitly found, and we have affirmed, that this statement was made voluntarily. Thus, admission of this statement is also to be reviewed under the harmless error standard.[8]

## IV

■ The Supreme Court in *Chapman* held that a constitutional error could be held harmless if the Court found the error to be "harmless beyond a reasonable doubt." 386 U.S. at 24, 87 S.Ct. at 828. Quoting its earlier decision in *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963), the Court said the test was " 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Chapman, supra*, 386 U.S. at 23, 87 S.Ct. at 827. We conclude that in this case there is no reasonable possibility that appellant's statements to police contributed to his conviction because virtually everything in the statements was otherwise presented to the jury, in part through appellant's own trial testimony.

We look first at the substance of the two statements. Detective Arnold testified at

6. *See also, e.g., United States v. Wilson*, 690 F.2d 1267, 1274–75 (9th Cir.1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 205, 78 L.Ed.2d 178 (1983); *United States v. Roper*, 681 F.2d 1354, 1359 (11th Cir.1982), *cert. denied*, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983); *United States v. Moody*, 649 F.2d 124, 127–28 (2d Cir.1981); *United States v. Plesons*, 560 F.2d 890, 892 (8th Cir.), *cert. denied*, 434 U.S. 966, 98 S.Ct. 506, 54 L.Ed.2d 452 (1977); *United States v. Kallevig*, 534 F.2d 411, 415 (1st Cir.1976); *Yarnal v. Brierley*, 468 F.2d 816, 817–18 (3d Cir.1972), *cert. denied*, 410 U.S. 940, 93 S.Ct. 1405, 35 L.Ed.2d 607 (1973).

7. Appellant's alternative argument with respect to the first statement is that appellant could not have knowingly and intelligently waived his Fifth and Sixth Amendment rights since he was not informed by Detective Arnold that Bernard Lee had died. There are few reported cases on this issue, but some courts have been receptive to this line of argument. *See, e.g., United States v. McCrary*, 643 F.2d 323 (5th Cir.1981); *Schenk v. Ellsworth*, 293 F.Supp. 26 (D.Mont.1968). *But see Collins v. Brierly*, 492 F.2d 735, 738 (3d Cir.) (en banc) (expressing "serious reservations" about interpreting *Miranda* to require police to inform suspects of the nature of the crime under investigation before beginning custodial interrogation), *cert. denied*, 419 U.S. 877, 95 S.Ct. 140, 42 L.Ed.2d 116 (1974). *See generally Com-*

*ment, Waiver of Rights in Police Interrogations: Miranda in the Lower Courts*, 36 U.CHI.L.REV. 413, 432–35 (1969). As noted above, there is no need for the court to consider the issue in this case because we hold that admission of the statement was error due to the inadequacy of the *Miranda* warnings. Even if we were to accept this alternative argument, however, we would still hold that the statement was "voluntary" for purposes of harmless error analysis. The record reveals that appellant knew Detective Arnold wanted to question him about his stabbing of Lee. Although he may not have been aware that Lee had died and therefore that he would face homicide charges, there is no indication that his statement was induced by threats, promises or any other coercive police action. The circumstances of appellant's interrogation do not approach those in *Mincey v. Arizona, supra*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290, or *New Jersey v. Portash, supra*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501.

8. Appellant presents the argument discussed above in note 7 with respect to the second statement, and the same analysis would apply. We note that the detective testified that by the time the second statement was made, appellant knew of Lee's death.

trial that appellant told him the following in his first statement. Appellant heard Lee banging at the door around 2:00 a.m. on the morning in question. At first appellant ignored the disturbance, but, annoyed when it continued, he got up and confronted Lee. Appellant told Lee to go away and come back in the morning to get his things. Appellant said that after he and Lee exchanged a few words, Lee pushed him. At that, appellant "grabbed for a knife that was on a nearby table and swung the knife at Mr. Lee, and cut him."

Arnold further testified that appellant told him that he had thrown away the knife but that he "declined to tell where." Also, appellant told the detective that Lee had had no weapon. Finally, Arnold said that appellant did not say that Lee had threatened him in any way.

As to appellant's second statement, Arnold testified that as he was filling out the arrest paperwork, appellant volunteered the comment, "I didn't think I cut him that bad." Although advised by Arnold that such remarks could be used against him, appellant also said that "he didn't mean to kill him, he just meant to scare him away," and that Lee had been drinking and was difficult to control.

We next examine other evidence adduced by the government that tended to establish the same facts admitted by appellant in his statements.

Maxine Clark, with whom appellant was living, testified that at about 2:00 a.m. on the morning in question, Bernard Lee knocked at the door and hollered that he wanted to get his clothes. She testified that after some delay, appellant got up, picked up a knife from a table and went downstairs. She heard appellant tell Lee to get away from the door, then she heard Lee say, "Man, look what you did." After that, Clark continued, appellant came upstairs and told her, "Baby, I did something." He then told her he had stabbed Lee.

Terrance Lewis, appellant's nephew, testified that he too had heard Lee banging at the door and that appellant had gone to answer it. A day after appellant's arrest, he overheard appellant tell other people that he knew he had stabbed Lee but that he would have called an ambulance if he had known that Lee "would have died or something."

Thomasina Ingram, a friend of appellant, testifying for the government, said that appellant told her the day after the incident in essence that he had stabbed Lee but that he had not known that Lee would die. Andrew Ingram, Thomasina Ingram's son, testified to the same effect.

Thus, the testimony of these four witnesses confirmed parts of appellant's statements to police, most notably that appellant knew he had stabbed Lee. Maxine Clark's testimony was even more incriminating in that it had appellant picking up a knife *before* he went downstairs.

The other incriminating details contained in appellant's statements that were not presented through these witnesses were presented through appellant's own trial testimony. At oral argument appellant contended that this court may look only to evidence presented in the government's case-in-chief in determining whether the error was harmless, and may not consider appellant's testimony in that connection. In the circumstances of this case, we reject that contention.

Our analysis of this point begins with *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). In that case, at the defendant's trial for felony murder the government had introduced confessions allegedly made by the defendant while in police custody. The substance of these confessions was that the defendant and two others, armed with a shotgun, had gone to the victim's house intending to rob him, and that the victim had been killed while resisting their entry into his home. At trial defendant took the stand and gave a different account. He testified that he and his companions had gone to the victim's home hoping to pawn the shotgun,

and that the victim was accidentally killed while defendant was presenting the gun to him for inspection.

The D.C. Circuit reversed the conviction on the ground the confessions had been illegally obtained and were therefore inadmissible against him. At Harrison's retrial, the confessions, of course, were not introduced, but, over defense objection, defendant's testimony from the first trial was read into evidence. The Supreme Court reversed the resulting conviction, holding that the government had failed to meet its burden of showing that its illegal action did not induce defendant's testimony at the earlier trial. The Court said:

> No such showing [of lack of inducement] has been made here. In his opening statement to the jury, defense counsel announced that the petitioner would not testify in his own behalf. Only after his confessions had been admitted in evidence did he take the stand. It thus appears that, but for the use of his confessions, the petitioner might not have testified at all. But even if the petitioner would have decided to testify whether or not his confessions had been used, it does not follow that he would have admitted being at the scene of the crime and holding the gun when the fatal shot was fired. On the contrary, the more natural inference is that no testimonial admission so damaging would have been made if the prosecutor had not already spread the petitioner's confessions before the jury. That is an inference the Government has not dispelled.

392 U.S. at 225–26, 88 S.Ct. at 2011–12 (footnotes omitted).

At oral argument appellant's counsel reasoned along just these lines, asserting that appellant might not have taken the stand if his statements had not come out in the government's case. Several courts have reversed convictions on this basis. *See, e.g., State v. Ayers,* 433 A.2d 356 (Me.

1981); *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979); *People v. Wilson,* 60 Ill.2d 235, 326 N.E.2d 378 (1975); *People v. Spencer,* 66 Cal.2d 158, 57 Cal.Rptr. 163, 424 P.2d 715 (1967) (en banc); *People v. Walker,* 108 Misc.2d 980, 438 N.Y.S.2d 65 (N.Y.Sup.Ct.1981), *aff'd mem.,* 90 A.D.2d 457, 454 N.Y.S.2d 1016 (1982). At least one court has ordered a remand to the trial court for a determination of whether the defendant's decision to testify was so impelled. *Smith v. Estelle,* 527 F.2d 430 (5th Cir.1976).

That step is unnecessary here. In contrast to the circumstances of *Harrison* and the other cases just cited, it is clear that appellant's decision to take the stand was compelled by the government's other evidence, outlined above. He had admitted to several people that he had stabbed Lee, and his girlfriend testified that he had gone into the confrontation armed with a knife.[9] In the face of this evidence, appellant's conviction was virtually assured unless he could produce evidence of self-defense or some other justification. And that is precisely what appellant tried to do in his testimony. Thus, we are satisfied that appellant's decision to take the stand was not induced by the introduction of appellant's statements to the police. At least two other courts have also distinguished *Harrison* on this basis. *See State v. Clark,* 296 N.W.2d 372 (Minn.1980); *State v. McDaniel,* 274 N.C. 574, 164 S.E.2d 469 (1968).

Our conclusion that appellant's *decision* to testify was not induced by the tainted evidence does not end our inquiry, however, for we must also consider whether the *content* of his testimony was so induced. We are mindful that the Supreme Court in *Harrison,* in the part of the opinion quoted above, said that the government must also dispel the inference "that no testimonial admission so damaging would have been made if the prosecutor had not already spread the petitioner's confessions

---

9. Appellant does not challenge the admission of any of the statements he made to his acquaint-    ances.

before the jury." 392 U.S. at 225–26, 88 S.Ct. at 2012. Few cases seem to have addressed this precise point. We note two cases, *Sherlock v. State*, 632 S.W.2d 604 (Tex.Crim.App.1982), and *Hawthorne v. State*, 408 So.2d 801 (Fla.Dist.Ct.App.1982) (per curiam), which, following *Harrison*, reversed convictions on the ground that the government had not shown that the defendant would have testified in the same manner but for the introduction of the illegally obtained evidence.

We conclude that in this case the content of appellant's trial testimony was not induced by admission of his statements to Detective Arnold. In *Harrison* the Supreme Court said that even if the defendant would have testified whether or not his confessions had been used, it did not follow that he would have admitted being at the scene of the crime and holding the gun when the fatal shot was fired. While the factual background of *Harrison* is not fully developed in the opinions of the Supreme Court and the United States Court of Appeals, it appears that, apart from the defendant's previous trial testimony, the only evidence against him was circumstantial: he was linked to an automobile which was in turn linked to the victim shortly before his death. *See Harrison v. United States*, 128 U.S.App.D.C. 245, 252–53, 387 F.2d 203, 210–11 (1967) (the ruling reversed by the Supreme Court).

In this case, by contrast, appellant's girlfriend and his nephew placed him at the scene of the crime in confrontation with the deceased. Four witnesses testified that appellant had admitted to having committed the stabbing. In the face of that evidence, it is clear that appellant could not have denied the basic facts leading to the fatal encounter.

It is true, of course, that if his statements to the detective had not been introduced, appellant might have felt more at liberty to slant his account of the incident by testifying, say, that Lee attacked him with a club or pulled a gun on him. But, as the Supreme Court has said in an opinion

rendered after *Harrison*, the privilege against self-incrimination "cannot be construed to include the right to commit perjury." *Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971). *See also Oregon v. Hass*, 420 U.S. 714, 721–22, 95 S.Ct. 1215, 1220–21, 43 L.Ed.2d 570 (1975). *Harris* and *Hass* make it clear that appellant is not entitled to testify completely free of the possibility of being impeached by uncoerced and voluntary statements inadmissible in the government's case-in-chief under *Miranda*.

■ Thus, we are satisfied that neither appellant's decision to testify nor the content of his testimony was dictated by the erroneous admission into evidence of statements secured in violation of *Miranda*, but were the result of the availability to the government of other evidence of appellant's conduct.

We turn now to appellant's trial testimony in order to consider it, together with the government's evidence, in determining whether admission of appellant's pretrial statements was harmless error. Appellant testified on direct examination that when he was awakened he was going to throw the key down to Lee, but that he instead went downstairs to tell Lee that he could not come in making so much noise because the neighbors would complain. He opened the door part way, but Lee pushed past him and came into the apartment. Appellant told Lee to come back later to get his things because he had already caused enough disturbance. When Lee insisted on removing his belongings, appellant picked up a knife that was lying nearby which he had been using to splice wires for a speaker he was making.

When Lee saw the knife, appellant continued, Lee said, "Yeah. All right. All right," and turned as if to walk out. Appellant, thinking Lee was leaving, turned his back to go toward the kitchen. But Lee did not leave. Instead, he again insisted on taking his belongings and came right up behind appellant. This scared appellant. Lee had never talked to him like this before

or "raised that kind of hell at me." We quote appellant's testimony on what happened next:

> By that time, when he was right up on me, I'm throwing my hand up and sticking the knife out like this, you know. Then he backed up, and he said, "You stuck me man," you know, and I looked at him, and I said—I didn't see any blood. I said, "Go 'head man. Just get on out of here. Just go on out ...."

Appellant then went back upstairs, where he told Maxine Clark that he thought he "might have hurt" Lee.

On cross-examination appellant admitted that Lee never said, "I'm going to get you" or "I'm mad at you." He also admitted that he did not see any weapon in Lee's hands. He would not concede the prosecutor's characterization that he "started swinging the knife," but he admitted when he turned around, "I stuck the knife—threw up my hands, and stuck my hand out." A moment later he rephrased it this way: "All I did was just threw up my hands, and I stuck the knife out like that and pulled the knife back." Appellant also agreed to the prosecutor's comment that he "thrust out the knife." Finally, he admitted that he had thrown away the knife because he knew he had done something wrong.

Thus, appellant made at trial virtually the same damaging admissions that he had made to Detective Arnold. He conceded that Lee was unarmed and had not directly threatened him. He admitted he picked up a knife and stuck it out at Lee and that he knew Lee might have been injured in that act. Finally, he acknowledged feelings of guilt which led him to dispose of the knife. Consequently, appellant's statements to the police were merely cumulative; we conclude that there was no reasonable possibility that this evidence contributed to appellant's conviction of manslaughter. *See Chapman v. California, supra,* 386 U.S. at 23, 87 S.Ct. at 827.

*Affirmed.*