Edward I. McCOY and Darryl
Woodard, Appellants,

v.

UNITED STATES, Appellee.

No. 03–CF–722, 03–CF–1184.

District of Columbia Court of Appeals.

Argued Oct. 5, 2005.
Decided Jan. 12, 2006.
As Amended Feb. 23, 2006.

Dennis M. Hart, Washington, appointed by the court, for appellant McCoy.

Winsome G. Gayle, Public Defender Service, with whom James Klein, Samia Fam, Eve Hanan, and Robin Walker, Public Defender Service, were on the brief, for appellant Woodard.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Kenneth Wainstein, United States Attorney, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, Elizabeth Trosman, and Daniel P. Butler, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, FARRELL, Associate Judge, and NEBEKER, Senior Judge.

NEBEKER, Senior Judge:

These appeals from convictions require the court to decide whether admission of a confession by each appellant was harmless beyond a reasonable doubt. The trial court had denied their motions to suppress the confessions, but after these appeals were noted, the Supreme Court of the United States decided *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), which, as the government recognizes, renders the confessions inadmissible.

▇ The threshold for harmlessness in erroneously admitting a confession has been set quite high. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). If there is no reasonable possibility that the offending evidence might have contributed to the conviction, the error is harmless beyond a reasonable doubt. *Dancy v. United States,* 745 A.2d 259, 273 (D.C.2000). We hold as to appellant Woodard that admission of his confession is not harmless by the *Chapman* standard. As to appellant McCoy, we hold the admission of his confession is harmless by that standard. The other issues McCoy rais-

es—severance and sufficiency of the evidence—we hold do not require reversal. Nor are we persuaded by McCoy's argument that the use of redacted statements presents a viable confrontation issue.

## BACKGROUND

In March 2002, two cars sped adjacent to one another through the Third Street Tunnel of this city. Gunfire from someone in the Volvo struck both occupants of the Chevrolet. Ebony Byrd, the passenger in the Chevrolet, helped the driver, Michael Cary, get to the hospital. While recuperating from his injuries there, police interviewed Cary, who identified appellant Darryl Woodard as the shooter.

Police then arrested Woodard and had him wait at the interview room at the station house. Thereafter, they questioned him about the shooting without giving him warnings, as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Throughout the ensuing forty-five minutes of continuous interrogation, Woodard implicated co-appellant Edward McCoy as the actual shooter, and also made incriminating statements against himself. Police then administered the *Miranda* warnings, obtained a waiver of his rights, activated an audio tape recorder, and had Woodard repeat the confessions he had just made to them. Several weeks later, McCoy was arrested on unrelated warrants, and police subsequently questioned him regarding the Third Street Tunnel shooting. Their "question first, Mirandize later" interrogation tactics closely resembled those used on Woodard, in that the officers' lengthy and persistent questioning resulted in incriminating statements, at which point the officers finally administered warnings, obtained a waiver, and had McCoy repeat the confession on videotape.

Before trial, both appellants moved to suppress the recordings of their post-*Miranda* confessions to the police. The motions were denied, and at trial, the tapes were admitted against them.[1] Appellants also moved to have their trials severed, but the court also denied this motion. The government then presented several witnesses, including victims Cary and Byrd. Cary and Byrd, who lived in the Lincoln–Westmoreland apartment complex, testified that on the night in question, they were at a nightclub in Prince George's County and attempted to have their picture taken at a photo booth there. They were unable to do so, though, because Woodard began dancing between them and the camera. Cary recognized Woodard and some of his friends there as residents of the Sursum Corda neighborhood. After a heated exchange of words, Cary once more attempted to have a photo taken, only to notice that Woodard's dancing again obstructed the camera. A brief fist fight ensued between Cary, Woodard, and their respective groups of friends, but thereafter for the following two hours, the nightclub remained peaceful.

As Cary left the club, he saw Woodard and three others walk to a Volvo. Cary drove away in the Chevrolet, only to notice that the Volvo was in pursuit. As Cary sped up, the Volvo did too, until both vehicles were moving rapidly through the Third Street Tunnel. At trial, Byrd remained reticent as to whom she saw shooting at her; the prosecution then impeached her with her grand jury testimony, in which she said that the Volvo pulled up alongside of the other car and that Woodard shot at them from the Volvo.

As the shots rang out, Cary testified that he heard Woodard shout "stop bullshitting," though Cary also admitted that at the time, he was more concerned with dodging the bullets than noting who was in the other car.

The government then presented Todd Lawton as a witness. Lawton also testified in regards to the photo booth scuffle, essentially corroborating Cary's story on that point. The Volvo did not leave until the Chevrolet did. He recounted that during the ride from the club, he was in the back seat of the Volvo with Woodard, while Jerome Edwards drove and McCoy sat in the front passenger seat. As the cars approached the Third Street Tunnel, McCoy shouted at Edwards to maintain pace alongside the Chevrolet. Lawton testified that, just before the shots were fired, Woodard put his sweatshirt hood over his head, and motioned for Lawton to do the same. Lawton did so because he "thought something was going to happen." His intuitions were correct, because he testified that soon thereafter, McCoy fired several shots at the Chevrolet using a chrome-colored .25 caliber pistol. Police later found a shell casing from an expended .25 caliber cartridge in the Volvo.

Next, a Jonathan Paige testified that the blue Volvo belonged to his mother. He knew McCoy "from the neighborhood," and the day after the shooting incident, he went to "confront" McCoy in regards to the incident, because he was upset that McCoy's use of the Volvo was "putting [his] mother in danger." When asked on direct examination how McCoy responded when Paige inquired about his involvement in the incident, Paige testified, "He said he shot out the car," and that McCoy "said he wish he'd never done it."[2]

---

1. The recordings were redacted, though, so that McCoy's confession made no mention of Woodard's name, and Woodard's confession made no mention of McCoy's name.

2. The prosecution's theory as to Woodard being merely an aider and abettor relied on the testimony of Lawton and Paige, which was at variance with Cary's statement to the police and Byrd's grand jury testimony, both of which implicated Woodard as the gunman. For the purpose of these appeals, these differences are of no moment.

The recordings of both Woodard and McCoy's confessions were played to the jury. Woodard was convicted of assault with a dangerous weapon (ADW)[3] under an aiding and abetting theory, and of conspiracy.[4] McCoy was convicted of conspiracy,[5] ADW against Cary (as a lesser included offense of assault with intent to kill while armed)[6] and a pendent count of possession of a firearm during that crime (PFCV)[7], aggravated assault while armed (AAWA)[8] against Cary and a pendent PFCV count, ADW against Byrd[9] and a pendent PFCV count, carrying a pistol without a license[10] or valid registration,[11] possession of ammunition without a license,[12] and misdemeanor destruction of property.[13] This appeal followed.

## DISCUSSION

The Supreme Court's recent holding in *Missouri v. Seibert, supra,* establishes that when police purposefully use a "question first, Mirandize later" interrogation technique, postwarning statements related to prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. 542 U.S. at 604–05, 610–11, 622, 124 S.Ct. 2601. That case limited—or at least explicitly distinguished—the holdings of *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and *Davis v. United States,* 724 A.2d 1163 (D.C.1998), which was this court's application of *Elstad. Seibert,* 542 U.S. at 611, 124 S.Ct. 2601. The trial court had relied on both of those

decisions in denying the motions to suppress the confessions. *Elstad* held that, when an interrogator has failed to administer the Miranda warnings in a good-faith but mistaken belief that the warnings were not required, then corrective measures might salvage the fruits of the interrogation. In this case, the government cannot and does not claim that good-faith mistake or curative measures make *Elstad* or *Davis* applicable.

However, the government proceeds to argue that, despite the introduction into evidence of the tainted confession, the convictions should still stand because the use of the confessions was harmless under the *Chapman* standard.

## STANDARD OF REVIEW

■ While the "beyond a reasonable doubt" measure seems to be unique among appellate standards of review, this court has alternatively phrased the rule thusly: if, after excluding the contents of the illegally obtained confession from the record, "there remains overwhelming evidence to support the jury's verdict," then admission of the confession into evidence will not warrant a new trial. *Hill v. United States,* 858 A.2d 435, 448 (D.C.2004); *Smith v. United States,* 529 A.2d 312, 318 (D.C. 1987). This wording suggests that we use a "cumulative" test: if the content of the improperly admitted confession is replicated *in toto* by other evidence, then the error is harmless. *See, e.g., Lewis v. Unit-*

---

3. D.C.Code § 22–402. All citations to the D.C.Code are from the 2001 edition.

4. D.C.Code § 22–1805a.

5. D.C.Code § 22–402.

6. D.C.Code §§ 22–401 and –4502.

7. D.C.Code § 22–4504(b).

8. D.C.Code §§ 22–404.01 and –4502.

9. D.C.Code § 22–402.

10. D.C.Code § 22–4504(a).

11. D.C.Code § 7–2502.01.

12. D.C.Code § 7–2506.01(3).

13. D.C.Code § 22–303.

*ed States,* 483 A.2d 1125, 1131 (D.C.1984) (admitting statement obtained in violation of *Miranda* held to be harmless beyond a reasonable doubt because substance of statement was presented to jury through other, untainted testimony). However, even if the content of a tainted confession is entirely cumulative, its introduction into evidence might—under quite narrow circumstances—still constitute reversible constitutional error. *Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). But *Fulminante* presented a coerced confession to a government informant and an uncoerced one to the informant's wife; each confession, in some aspects, corroborated the other.

## APPELLANT WOODARD

Because the central issue on appeal against Woodard concerns whether this error was harmless by the higher standard, we turn our attention to the manner in which the confession was used at trial, and to the other evidence with which the jury could have used to convict him. Without Woodard's confession, the evidence against him consisted almost entirely of the following, as the government related to the jury in its opening argument: Woodard was in the back seat of the Volvo, seated next to government witness Todd Lawton. The Volvo followed Cary's car, and as the vehicles were driving through the Third Street Tunnel, the front seat passenger, McCoy, shot at Cary's car.

█ Woodard's confession, while partially cumulative of other testimony, pre-

sented the jury with two significant pieces of evidence: that Woodard was involved in the planning of the shooting,[14] and that he instructed McCoy to "get at them." [15] This testimony is not found anywhere else in the government's case against Woodard. Because it is likely that the content of Woodard's confession convinced the jury that the government had prove each of the elements of ADW and conspiracy beyond a reasonable doubt, the error was not harmless.

### I. Aiding and Abetting the ADW

The judge's instructions on aiding and abetting, based on Criminal Jury Instructions for the District of Columbia, No. 4.02 (4th ed.2002) read as follows: "To find that a defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the person or persons who committed the crime[;] that he participated in the crime as something he wished to bring about[;] and that he intended by his actions to make it succeed." The judge further instructed that, to convict, the jury must find "some affirmative conduct by a defendant to help in planning or carrying out the crime," and that "mere physical presence" at the time and place of the crime would be insufficient.

Without the "get at them" statement, Woodard was just a motionless back-seat passenger. In the recording of the confession, the interrogating police officers made sure there was no doubt about the interpretation of this phrase: Woodard meant

---

**14.**
Q: Where did you guys plan on shooting them at? Did you, did you plan on shooting them in the tunnel or wait until they get up to 8th Street? A: Before the tunnel . . . . Q: So, you were going to shoot them up on the freeway first? A: Yeah."

**15.**

"Q: When you guys conversed in the tunnel, what did you guys say? Did you say let's bust them, let's kill them, let's what? A: Get at them. Q: Let's get at them? A: Yeah. Q: And everybody's interpretation let's get at them is what? Kill them? . . . Shoot them? A: Yeah."

"kill them," "shoot them." The words alone, coupled with Woodard's interpretation, create a strong inference of guilt not replicated elsewhere in the record. The absence of that statement would have made Woodard little different than Lawton, the man seated next to Woodard in the Volvo who became a government witness against Woodard.[16] The "let's get at them" statement creates an unacceptable risk that the jury used that statement to satisfy the intent and participation elements of aiding and abetting; the likelihood that those words converted Woodard's "mere physical presence" into "some affirmative conduct" is too great to deem the error harmless.[17]

## II. Conspiracy

The trial judge instructed the jury on conspiracy as follows: "For any defendant to be convicted of the crime of conspiracy, the government must prove three things beyond a reasonable doubt. First, that on March 2nd, 2002, there was an agreement to commit assault with a dangerous weapon. Two, that the defendant intentionally joined in that agreement. And three, that one of the people involved in the conspiracy did one of the overt acts charged," which included following Cary's car, chasing them at a high rate of speed, pulling alongside Cary's car, and firing shots at the car.

None of the government's three witnesses who testified against Woodard—Cary, Byrd, or Lawton—were able to provide evidence showing that Woodard agreed to the ADW or performed any of the overt acts listed. Therefore, the evidence satisfying the elements of conspiracy necessarily came from Woodard's confession. As with the aiding and abetting conviction, the prosecution heavily relied on the portion of the confession in which Woodard helped plan the timing and location of the shooting.[18.] The government did not merely mention the content of the confession in passing, either: the entire audiotape was played for the jury, and the jurors received a typed transcript of the confession so that they could follow along, word for word.

Additionally, in relation to both the ADW and the conspiracy charges, Woodard's confession provided a far more credible motive for why Woodard might have wanted to hurt Cary. In his taped confession, when the police asked Woodard why the incident took place, he replied that it was due to neighborhood rivalries. ("Q: Why did this happen? A: Over a beef. Q. Over a beef? What kind of beef? A: A hood beef"). This admitted animus against Cary, who was affiliated with rival turf, also could have provided the basis on which the jury convicted.[19] (Occupants of

---

**16.** The only difference, according to the government, would be that Woodard had the animus against Cary because of the photo booth incident at the club.

**17.** The prosecution's reliance on the "get at them" statement during its opening, closing, and rebuttal arguments also strongly suggests a "reasonable possibility" that the jury relied on those words in convicting Woodard. *See Hill, supra,* 858 A.2d at 449 (admitting the tainted confession at trial was constitutional error, in part due to the "centrality of appellant's unwarned statement to the government's case.").

**18.** During rebuttal, the prosecution read the following to the jury from the transcript of Woodard's taped confession:

"Q: When you guys conversed in the tunnel, what did you guys say? Did you say let's bust them, let's kill them, let's what? A: Get at them. Q: Let's get at them? A: Yeah. Q: And everybody's interpretation let's get at them is what? Kill them? . . . Shoot them? A: Yeah."

**19.** Other witnesses had testified that Woodard and Cary had been in a fist fight at the club, providing a basis for another motive. However, the jury could easily have disbelieved

the Volvo hailed from Sursum Corda, while Cary and Byrd were from Lincoln–Westmoreland.)

■ In claiming that Woodard's confession was entirely cumulative of other testimony (and therefore harmless), the government points to three pieces of evidence that came from sources other than the confession: after the shots were fired, Woodard shouted "stop bullshitting;" the Volvo was intentionally driven to follow Cary's car out from the club's parking lot to the Third Street Tunnel; and just before the shooting took place, Woodard put up the hood on his sweatshirt and cued Lawton to do likewise. This evidence only establishes that Woodard was present at the scene and possibly aware that shots would be fired. Of course, mere presence or awareness is insufficient to make out a conviction for either aiding and abetting or conspiracy. *See, e.g., Bolden v. United States,* 835 A.2d 532, 535 (D.C.2003); *Speight v. United States,* 599 A.2d 794, 796–97 (D.C.1991). While true that, when combined with the surrounding circumstances (*e.g.,* the Volvo's occupants waited for Cary's car to leave the club before following at high speed), the jury might still have found an agreement and an overt act, we are not called on to determine what the jury could conceivably have decided without the tainted confession; we resolve only whether there is a "reasonable possibility that the evidence complained of

might have contributed to the conviction." *Dancy, supra,* 745 A.2d at 273, quoting *Chapman v. California, supra,* 386 U.S. at 23, 87 S.Ct. 824. In the case of Woodard, we hold that there is.

The intentional pursuit of Cary's car imputes nothing as to Woodard specifically, because he was only one of four occupants of the car. Woodard's shouted words were ambiguous at best; the government argues that it was Woodard threatening Cary, but it just as easily could have been censuring McCoy for taking things too far.[20] That Woodard put up his hood proves only awareness of the impending crime, which alone does not indicate that he was engaged in the type of "organized, planned, and concerted activity" required to make out a conspiracy. *Morten v. United States,* 856 A.2d 595, 601 (D.C.2004).[21] Without the confession, the evidence paints the picture of a man sitting passively in the back seat of a car.

The evidence which the government claims makes the confession cumulative is meek when compared with the undeniable probative force of hearing Woodard's own incriminating statements made against himself. "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Fulminante, supra,* 499 U.S. at 296, 111 S.Ct. 1246 (citations and quotation marks omitted).[22] While the evi-

that motive, since several hours of peaceful nightclubbing separated that altercation from the shooting in the Third Street Tunnel. Also, given the frivolous basis for the scuffle in the club (the photo booth incident), the jury might well have been more swayed by the "hood beef" motive.

**20.** Without the corroboration provided by Woodard's confession, the jury may have wondered whether Woodard shouted anything at all, since neither Byrd nor Lawton

recalled any words from Woodard at the time of the shooting.

**21.** Additionally, while Lawton did testify that Woodard donned his hood before the shooting, he did not testify that there was any conversation in the car regarding the impending shooting.

**22.** In some respects, the facts before us present a more compelling case for prejudicial error than *Fulminante.* In that case, defendant's confession was relayed to the jury via

dence that the government points to might be sufficient to withstand a challenge to a denial of a motion for judgment of acquittal, without the confession, it would have required the jury to make several inferential leaps of logic in order to fill in all of the gaps. Woodard's confession very likely filled in many of these gaps for the jury. Because the Woodard confession provided the jury with the most incriminating evidence against him, which appears nowhere else in the record, admission of the confession was not harmless.[23] *See Smith, supra,* 529 A.2d at 318 (finding that where a necessary element to convict is supplied only by the tainted evidence, the error is not harmless).

## APPELLANT MCCOY

### I. Harmless Error

■ As to McCoy, we are presented with the same issues, but a distinct set of facts compels the opposite result. The government again concedes that, under *Siebert,* the videotape of the confession was improperly admitted, but asserts that the error was harmless beyond a reasonable doubt. The videotape revealed McCoy confessed that a rivalry existed between his group from Sursum Corda and others from Lincoln–Westmoreland;

that he saw a male and a female leave the club together in a white car; that he had seen the female once before but had never seen the male; that it was Edwards who drove the Volvo and handed McCoy a .25 caliber revolver;[24] that, from the front passenger seat of the Volvo, McCoy shot at Cary several times in the Third Street Tunnel; and that he shot at them not out of vengeance but only because he "got caught up in the moment."

■ While McCoy correctly notes that the prosecutor did refer to the contents of the improperly obtained confession during the opening and closing arguments—and especially in the rebuttal argument—this alone will not necessarily make use of the confession reversible constitutional error.[25] The standard, as enunciated by this court, is whether "overwhelming evidence" existed to support the conviction, independent of the tainted confession. *Hill, supra,* 858 A.2d at 447. The available evidence clearly satisfies this standard by directly identifying McCoy as the shooter.

The core of McCoy's convictions consisted of ADW and aggravated assault inflicted upon Cary, and of ADW upon Byrd. Therefore, the issue here is whether, without the improperly admitted confession,

---

testimony from a decidedly untrustworthy informant with ties to gang crime. 499 U.S. at 283–84, 111 S.Ct. 1246. Here, the confession comes by way of a taped audio statement and from an experienced police officer. Because the manner by which the jury heard the confession made it undeniably credible, the jury likely considered it more carefully than other evidence presented.

23. Moreover, the cases to which the government cites for support are all inapposite: *Dancy, supra,* 745 A.2d 259, and *Miley v. United States,* 477 A.2d 720 (D.C.1984), address the effects of admitting into evidence statements made to officers that did not confess appellant's guilt. In *Lewis, supra,* 483

A.2d at 1131, defendant's own trial testimony essentially repeated what he said in the illegally obtained confession.

24. The jury also heard forensics evidence indicating the presence of a .25 spent shell in the Volvo after the shooting.

25. Additionally, the prosecutor by no means relied solely on the videotaped confession. Rather, during opening arguments he mentioned the confession only after emphasizing the expected testimony from Lawton and the two victims. During closing arguments, he spent more time speaking to the jury about other evidence unrelated to the confession than he did on McCoy's own words.

overwhelming evidence existed to show that McCoy fired the pistol at the white Chevrolet. Testimony of Lawton, Paige and Cary unquestionably provided this evidence. Lawton, who was in the back seat of the Volvo during the shooting, testified that the Volvo followed the white car, and as the cars drove through the Third Street Tunnel, McCoy leaned out of the window and fired at the other car. Cary also testified that he saw McCoy shoot at him from the Volvo.

Paige, too, relayed to the jury that McCoy had plainly admitted shooting at the Chevrolet. While the jury may have accounted for the fact that Paige testified as part of a plea deal, Paige had no motive to invent the circumstances of his conversation with McCoy, which strongly bolsters the credibility of his testimony:[26] he went to "confront" McCoy about endangering Paige's mother by using her car to carry out the shooting. Thus, even without the improperly admitted confession to the police, the jury still would have heard McCoy confess to Paige that he had shot at the Chevrolet.

Though certain cases may force the court to agonize over the counterfactual— pondering the outcome of a trial if certain evidence had not been admitted—this is not one such case. It may be stated with near certitude that the jury would have convicted McCoy even if the trial judge had granted his motion to suppress his confession. McCoy admitted shooting at the Chevrolet in his videotaped confession, but that information is entirely cumulative of the testimony of Lawton, Cary, and especially Paige, to whom McCoy also came clean. See Derrington v. United States, 488 A.2d 1314, 1335 (D.C.1985) (finding harmless error where "virtually everything" in the officer's testimony

about the defendant's confession was otherwise presented to the jury); Milton v. Wainwright, 407 U.S. 371, 372–73, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) ("The jury, in addition to hearing the challenged testimony, was presented with overwhelming evidence of petitioner's guilt, including no less than three full confessions that were made by petitioner prior to his indictment").

Because we find the introduction of the confession harmless as to McCoy, we now address the remainder of his claims.

## II. Sufficiency of the Evidence

■ McCoy argues that the trial court erred when it denied McCoy's motion for judgment of acquittal in regards to the counts of conspiracy and ADW against Byrd. In reviewing a claim of insufficient evidence, this court must determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, reviewing the evidence in the light most favorable to the government, and "giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." Hart v. United States, 863 A.2d 866, 873 (D.C.2004), quoting Curry v. United States, 520 A.2d 255, 263 (D.C.1987). "We do not distinguish between direct and circumstantial evidence." Ruffin v. United States, 642 A.2d 1288, 1291 (D.C.1994).

■ McCoy's first claim is that insufficient evidence existed for a reasonable juror to have found that the government proved conspiracy, which consists of the following elements: that an agreement existed between two or more people to commit a criminal offense; that the defendant knowingly and voluntarily participated in the agreement, intending to commit a

---

**26.** In any case, Paige also testified that he had cooperated with police and told them of McCoy's confession to him before any plea arrangement had been made.

criminal objective; and that, in furtherance of and during the conspiracy, a co-conspirator committed at least one overt act. *McCullough v. United States*, 827 A.2d 48, 58 (D.C.2003).

Without resorting to the contents of the improperly admitted confession, there was more than enough evidence to submit the issue to the jury. The jury heard testimony that, although Edwards was the driver and McCoy the passenger, the Volvo waited for the Chevrolet to pull out of the lot, and that the Volvo proceeded to chase it at high speeds through the city. Lawton testified that as the Volvo closed in on the Chevrolet, McCoy screamed instructions to Edwards so that the Volvo would remain adjacent to the Chevrolet in the tunnel. And of course, Paige told the jury that McCoy had admitted to performing the principle overt act: shooting at the victims.

Based on these facts, a reasonable juror could have found that the government had proven all three elements of conspiracy. That one occupant of the Volvo drove while the other fired gunshots and shouted instructions is enough to infer an agreement and knowing participation in the ADW. Paige's testimony that McCoy had admitted to performing the principal overt act—

shooting at the victims—is sufficient to deduce that an overt act was committed in furtherance of the agreement.

McCoy's other claim of insufficiency addresses the evidence pertaining to the ADW conviction in which Byrd was the victim. Because ADW is a general intent crime,[27] the government need only prove that the defendant had "knowledge of the passenger's presence" to show that he attempted to injure her; *i.e.*, specific intent to injure that victim is unnecessary. *Ruffin, supra*, 642 A.2d at 1296.

■ Without regard to McCoy's admission that he knew both Cary and Byrd were in the Chevrolet, the record still demonstrates as much. The Chevrolet was immediately to the right of the Volvo, and as McCoy leaned out of the passenger side window to fire the shots, he would have had an unobstructed line of sight directly into the Chevrolet. The jury could have reasonably inferred from these facts that McCoy realized that Cary was not alone in the car, and hence, sufficient evidence existed for the ADW conviction. *See id.* at 1296 (close proximity to car with untinted windows suggested that defendant could see its occupants).[28]

---

27. ADW is comprised of four elements:
 (1) an attempt, with force or violence, to injure another person, or a menacing threat, which may or may not be accompanied by a specific intent to injure; (2) the apparent present ability to injure the victim; (3) a general intent to commit the act or acts which constitute the assault; and (4) the use of a dangerous weapon in committing the assault.

 *Frye v. United States*, —— A.2d ——, ——, No. 02–CF–1233, slip op. at 24 (D.C. October 14, 2005).

28. Appellant's reliance on *Joiner v. United States*, 585 A.2d 176 (D.C.1991), *Horton v. United States*, 541 A.2d 604, 612 n. 10 (D.C. 1988), and *United States v. Alexander*, 152 U.S.App. D.C. 371, 471 F.2d 923, *cert. denied*,

409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972), is unavailing. In those cases, it was held that a single assaultive act—directed at a group of individuals, but injuring no one—bears only one count of assault. Here, in contrast, "where multiple shots are fired at more than one person, multiple convictions are appropriate." *Ruffin*, 642 A.2d at 1296. Appellant's remaining cases, *Ladner v. United States*, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958), and *Smith v. United States*, 295 A.2d 60 (D.C.1972), are inapplicable because they address "threat to do bodily harm" assault, whereas here the government has charged "attempted-battery" assault. The elements differ as to each type. *Parks v. United States*, 627 A.2d 1, 4–5 (D.C.1993); *see also Ruffin*, 642 A.2d at 1297 (distinguishing a

### III. Severance

 McCoy's next argument is that the trial court erred in denying his motion to sever his case from Woodard's, because the jury heard the contents of Woodard's confession, which implicated McCoy. The decision to conduct a joint trial for defendants indicted together is "committed to the sound discretion of the trial court," and this court will reverse such a decision "only upon a clear showing of abuse of discretion." *Boone v. United States,* 769 A.2d 811, 818 (D.C.2001) (citations omitted).

Because of the careful precautions taken with respect to the Woodard confession, we detect no error and hold that the trial judge acted within his discretion when denying McCoy's motion to sever. Two crucial measures undertaken by the trial judge compensated for any possible prejudice which might have emanated from the Woodard confession: first, the Woodard confession was redacted to eliminate any reference to McCoy,[29] and also, the judge instructed the jury several times that Woodard's confession could be used only against Woodard. In light of the trial judge's precautions, we remain consistent with this jurisdiction's case law in affirming the decision not to sever. *Plater v. United States,* 745 A.2d 953, 961 (D.C. 2000) (confession redacted of names but still referencing both defendant and co-defendant as "we" did not merit severance).[30]

 Related to McCoy's severance claim is his contention that the court's denial of the motion to sever and of the motion to suppress Woodard's confession was violative of the Sixth Amendment's Confrontation Clause, as recently interpreted by the Supreme Court in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *Crawford* held that an out-of-court testimonial statement, offered against a defendant, is admissible only if the defendant had a prior opportunity to cross-examine the declarant, who has since become unavailable. *Id.* at 68, 124 S.Ct. 1354. The facts here do not trigger a *Crawford* issue, because Woodard's statement was offered only against Woodard, and not against McCoy, as the court's instructions to the jury made clear. Where references to one defendant in a co-defendant's statement are removed or replaced, admission of the redacted statement will not violate the Confrontation Clause if, "when viewed together with other evidence, the statement does not create an inevitable association with the defendant, and a proper limiting instruction is given." *United States v. Washington,* 293 U.S.App. D.C. 208, 212–13, 952 F.2d 1402, 1406–07 (1991), *distinguishing Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620,

---

multiple gunshot, multiple victim assault from *Alexander* and *Ladner* ).

**29.** Therefore, McCoy's reliance on *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), is misplaced, as that case addressed the admission of a facially incriminating, unredacted confession.

**30.** In spite of the court's limiting instructions, McCoy claims that failure to sever the trials prejudiced him, because the jury's conspiracy conviction "must have been based on the statement of the co-defendant." But as discussed, *supra,* sufficient evidence existed to find McCoy's participation in the conspiracy, independent of the confessions to the police. In this context, then, appellant cannot rely on *Akins v. United States,* 679 A.2d 1017, 1031 (D.C.1996), which held that, "in a joint conspiracy trial where the government relies on a theory of vicarious liability, statements may not be introduced under ... any ... hearsay exception that is not reliability-based," because in this case, the government did not use a theory of vicarious liability, but rather had to prove all traditional elements of conspiracy.

20 L.Ed.2d 476 (1968). "Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant. This accords with the almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

## IV. Merger

■ The Double Jeopardy Clause compels merger of duplicative convictions for the same offense, so as to leave only a single sentence for that single offense. *Brown v. United States*, 795 A.2d 56, 63 (D.C.2002). McCoy argues—and the government concedes—that the ADW and AAWA convictions merge, as do the PFCV convictions related to the crimes against Cary and Byrd.

Under the facts presented here, several PFCV convictions merge into one, because although McCoy fired multiple shots at multiple victims, the record indicates that he did so in the span of a very short period of time, in which he would not have had a chance to reflect on his actions between shots fired. *See Sanders v. United States*, 809 A.2d 584, 604 (D.C.2002), *cert. denied*, 538 U.S. 937, 123 S.Ct. 1602, 155 L.Ed.2d 340 (2003) (multiple PFCV convictions did not merge because defendants had reached a "fork in the road" between the first and second predicate crime, in which they had the opportunity to reflect on the import of their successive actions). The convictions for ADW and AAWA also merged, as "ADW is a lesser-included offense of AAWA." *Frye, supra,* —— A.2d at —— n. 4, slip op. at 25 n. 4.

For the foregoing reasons, as to Woodard the convictions are reversed, and as to McCoy the case is remanded to the trial court for resentencing consistent with this opinion, but affirmed in all other respects.

*So ordered.*