*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-BG-0637

IN RE AMANDA HAINES,
An Attorney Licensed to Practice in the State of New York, &

FERNANDO CAMPOAMOR-SÁNCHEZ,
A Member of the Bar of the District of Columbia Court of Appeals
(Bar Registration No. 451210), RESPONDENTS.

On Report and Recommendation of
the Board on Professional Responsibility
(20-BD-041; DDN: 261-16, *et al.*)

(Argued January 29, 2025                    Decided August 21, 2025)

*Sarah R. Fink*, with whom *Justin Dillon* was on the brief, for Respondent Haines.

*Daniel G. Randolph*, with whom *Mark H. Lynch* and *Molly J. Daggett* was on the brief, for Respondent Campoamor-Sánchez.

*Hamilton P. Fox, III*, Disciplinary Counsel, with whom *Theodore Meltzer*, Senior Assistant Disciplinary Counsel, was on the brief, for the Office of Disciplinary Counsel.

Before BLACKBURNE-RIGSBY, *Chief Judge*, HOWARD, *Associate Judge*, and GLICKMAN, *Senior Judge*.

PER CURIAM: In this appeal we are asked to review the Board on Professional Responsibility's (the Board) determination that respondent Amanda Haines failed to disclose exculpatory information in contravention of her ethical duties as a prosecutor, as well as the Board's determination that respondent Fernando Campoamor-Sánchez did not violate his ethical duties for related conduct.[1] Resolution of these questions requires us to assess the Board's finding that the existence of a key witness's prior "debrief" with law enforcement constituted exculpatory information and, if so, whether Ms. Haines was ethically obligated to disclose the fact of the debrief to a criminal defendant. We are also tasked with reviewing the Board's finding that withholding exculpatory information constitutes unethical interference with the administration of justice.[2] Finally, we assess what

---

[1] Ms. Haines and Mr. Campoamor-Sánchez were charged with failure to disclose exculpatory information under D.C. Rule of Professional Conduct 3.8(e). *See* D.C. R. Pro. Conduct 3.8(e) (2007). Rule 3.8(e) prohibits prosecutors from intentionally failing to disclose information that they know or reasonably should know tends to negate the guilt of the accused or mitigate the offense for which they are charged. *Id.* On May 6, 2025, the text of this prohibition was amended, and the provision was redesignated as Rule 3.8(d). *See* D.C. R. Pro. Conduct 3.8(d) (2025). As discussed below, this amendment does not alter the substance of the rule, nor does it compel us to modify our analysis. Because Ms. Haines and Mr. Campoamor-Sánchez were charged under the pre-amendment rules regime, we refer to Rule 3.8(e) throughout this opinion.

[2] *See id.* at 8.4(d). Rule 8.4(d) prohibits attorneys from engaging in conduct that seriously interferes with the administration of justice. *Id.*

sanction is merited for withholding exculpatory information and seriously interfering with the administration of justice.

The disappearance and murder of Chandra Levy in 2001 attracted national attention. The case went cold, but around 2008 investigators began to focus their attention on Ingmar Guandique. While watching television in prison, Armando Morales saw a report naming Mr. Guandique as the prime suspect in the Levy murder. Mr. Morales and Mr. Guandique had previously been incarcerated together, during which time—according to Mr. Morales—Mr. Guandique privately confessed to the Levy murder. After seeing the television report, Mr. Morales submitted a letter to law enforcement detailing Mr. Guandique's confession. In the introduction of the letter, Mr. Morales revealed that he had previously "debriefed to law enforcement about his gang involvement."

Mr. Guandique was subsequently indicted for the Levy murder and went to trial in 2010. The lead prosecutor was Amanda Haines, while Fernando Campoamor-Sánchez was another prosecutor on the government's trial team. At trial, Mr. Morales was the sole witness to testify that Mr. Guandique confessed to the murder of Ms. Levy. During his testimony, Mr. Morales was portrayed as a formerly hardened criminal whose reformed values compelled him to come forward to testify. The fact that Mr. Morales previously debriefed with law enforcement was

not disclosed prior to or during trial. At the end of trial, Mr. Guandique was convicted and sentenced to sixty years in prison.

Approximately two years later, the Fresno, California police department contacted the Levy prosecution team to reveal that Mr. Morales had an extensive history of cooperation with law enforcement. This information was passed along to Mr. Guandique's counsel, who moved for a new trial on the grounds that Mr. Morales's debrief was impeachment evidence that should have been disclosed prior to trial. Following multiple post-conviction hearings concerning the motion for a new trial, the government withdrew its opposition to the motion and moved to dismiss the indictment against Mr. Guandique with prejudice.

Thereafter, Disciplinary Counsel charged Ms. Haines and Mr. Campoamor-Sánchez with failing to disclose information that tended to discredit a key government witness in violation of D.C. Rules of Professional Conduct 3.8(e) and 8.4(d). Ms. Haines was also charged with violating Rule 1.6(a) by impermissibly disclosing client confidences (namely, internal U.S. Attorney's Office email communications concerning the prosecution of Mr. Guandique) in a personal email to her boyfriend. The Ad Hoc Committee of the Board on Professional Responsibility (the Hearing Committee) recommended that the charges against Mr. Campoamor-Sánchez be dropped, but found that Ms. Haines violated

Rules 3.8(e), 8.4(d), and 1.6(a), and recommended that she be suspended from the practice of law for ninety days. The Board on Professional Responsibility (the Board) substantially adopted the Hearing Committee's findings, recommending that Ms. Haines be suspended from the practice of law for sixty days and the charges against Mr. Campoamor-Sánchez be dropped.

On appeal, Ms. Haines argues that she did not violate Rule 3.8(e), contending that the fact of Mr. Morales's debrief was not exculpatory. Disciplinary Counsel counters that the fact of the debrief was impeachment information subject to disclosure. Ms. Haines also argues that she did not know, nor should she reasonably have known, of the debrief's exculpatory value. Disciplinary Counsel contends that Ms. Haines reasonably should have known of the information's exculpatory nature and that the Board erred in finding that she lacked actual knowledge of this fact. Ms. Haines further asserts that her conduct was insufficiently egregious to have violated Rule 8.4(d), while Disciplinary Counsel argues that Ms. Haines's conduct was sufficient to violate that rule. Finally, Ms. Haines argues that she should not be sanctioned for violating Rules 3.8(e) and 8.4(d), and that, at most, she should receive an informal admonition for violating Rule 1.6. Disciplinary Counsel counters that precedent compels a suspension of no less than six months for Ms. Haines's violation of Rules 3.8(e), 8.4(d), and 1.6.

Also on appeal is the Board's recommendation to dismiss the charges against Mr. Campoamor-Sánchez. Disciplinary Counsel argues that because Mr. Campoamor-Sánchez had knowledge of the exculpatory information and responsibility for presenting Mr. Morales at trial, his failure to disclose constitutes a violation of Rules 3.8(e) and 8.4(d).[3] Mr. Campoamor-Sánchez contends that he was not responsible for disclosing *Giglio* material and thus not responsible for disclosing the fact of the debrief. He further asserts that if he did violate Rules 3.8(e) and 8.4(d), *In re Kline*, 113 A.3d 202 (D.C. 2015), precludes imposition of a sanction.

Upon review of the record, we conclude that the Board's findings of fact are supported by substantial evidence. We also conclude that the Board's recommended disposition as to Ms. Haines fails to account for the totality of the circumstances and merits a downward variance, while its recommended disposition as to Mr. Campoamor-Sánchez is warranted. Accordingly, Ms. Haines is suspended from the practice of law in the District of Columbia for sixty days, stayed as to all in favor of one year of probation. Additionally, we hold that Mr. Campoamor-Sánchez did not violate the Rules of Professional Conduct.

---

[3] This is despite the fact that Ms. Haines ultimately presented Mr. Morales at trial.

## I.     Factual and Procedural Background

### A.     The Murder of Chandra Levy and the Zaldivar Letter

Sometime during the early afternoon of May 1, 2001, congressional intern Chandra Levy left her apartment, never to be seen alive again.  In the summer of 2001, Ingmar Guandique was charged with assaulting two separate women in Rock Creek Park, but those attacks were, at the time, not connected to Ms. Levy's disappearance.  In September of that year, Mr. Guandique pleaded guilty to the assaults and received a ten-year prison sentence.  Then, in the morning hours of May 22, 2002, a man walking his dog in Rock Creek Park stumbled across the remains of the murdered Ms. Levy.

The Levy case went cold, as Ms. Levy's death and Mr. Guandique's attacks were not initially connected.  In 2007, Amanda Haines, an Assistant United States Attorney for the District of Columbia working primarily on unsolved homicide cases involving female victims, became the lead investigator on the Levy case.  She was joined on the case by Fernando Campoamor-Sánchez, another Assistant United States Attorney for the District of Columbia, in September of that year.  By 2008, there were media reports that Ms. Haines's team had identified Mr. Guandique as the prime suspect in Ms. Levy's murder.

On March 24, 2009, the investigation team received a three-page letter, dated February 23, 2009, written by federal inmate Miguel Zaldivar on behalf of another federal inmate, Armando Morales (the Zaldivar letter). Mr. Zaldivar wrote that Mr. Morales knew who killed Mr. Levy and was willing to assist the government in bringing the killer to justice. The letter presented a narrative delivered by Mr. Morales and was intended to "capture the essence" of his knowledge of the Levy case.

According to Mr. Morales, he and Mr. Guandique were cellmates for four months in 2006, during which time Mr. Guandique revealed to Mr. Morales that he had attacked Ms. Levy and "was worried about being charged with [her] murder." Mr. Morales did not report Mr. Guandique's admission at this time, but, approximately three years later, in 2009, divulged the confession to Mr. Zaldivar after seeing a report about Ms. Levy's murder on CNN. The first page of the letter also revealed that Mr. Morales was a founder of the Fresno Bulldogs gang, although he had dropped out of the gang and—critically to this proceeding—"debriefed to law enforcement about his gang involvement."[4] The letter did not indicate whether

---

[4] It is unclear from the Zaldivar letter itself what the scope of the so-called debrief was. As discussed below, post-trial developments revealed that Mr. Morales cooperated with Fresno, California law enforcement in the 1990s by providing information about two murders. His cooperation included several interviews and a written statement about his gang activities.

Mr. Morales's debriefing was limited to his own conduct, whether he refused to implicate others, or whether he asked for or received any benefit for cooperating.

## B.  Mr. Guandique's Indictment and Pre-Trial Preparations

Ms. Haines's team verified that Mr. Morales had been imprisoned with Mr. Guandique in 2006 and arranged to bring Mr. Morales to Washington, D.C. to testify before a grand jury.  On April 20, 2009, Mr. Campoamor-Sánchez examined Mr. Morales before the grand jury.  Mr. Morales testified that he "didn't try to do things right" at the time Mr. Guandique confessed to him but had subsequently "chang[ed his] value system" and was "trying to become a better man."  Mr. Morales further testified that, when Mr. Zaldivar asked whether he would "do something" with his knowledge about Mr. Guandique, he "got nervous" because he had "never done that before" and did not trust the police.  Mr. Campoamor-Sánchez questioned Mr. Morales about various impeachment information, including his convictions, prison sentence, and gang involvement.  He also asked Mr. Morales to verify the contents of the Zaldivar letter.[5]  Mr. Campoamor-Sánchez cited to specific passages on the second and third pages of the Zaldivar letter, but he did not question Mr. Morales about his statement that he had previously "debriefed to law

---

[5] Mr. Campoamor-Sánchez offered the entire Zaldivar letter as a grand jury exhibit.

enforcement about his gang involvement." Consequently, the grand jury transcript does not include any indication that Mr. Morales had cooperated with law enforcement prior to coming forward with information about Mr. Guandique.

Shortly after Mr. Morales delivered his testimony, on May 19, 2009, Mr. Guandique was indicted for Ms. Levy's murder.

As preparation for Mr. Guandique's trial commenced, the defense moved for disclosure of the identities of any prisoner witnesses the government might call against the defendant. In its notice to the defense, the government referred to these witnesses as "confession witnesses."[6] Ms. Haines and Mr. Campoamor-Sánchez represented to the trial court that there was no need for the court to order production of potentially exculpatory information concerning the confession witnesses because the prosecution would voluntarily make such disclosures. In a written opposition to the defense's motion for a pre-trial *Brady* order dated June 24, 2010, Ms. Haines and Mr. Campoamor-Sánchez argued that "solely impeaching" evidence need not be produced until two weeks prior to trial. Notwithstanding this position, Ms. Haines and Mr. Campoamor-Sánchez represented that if such evidence "require[d] investigation," the government would "turn that information over in advance or

---

[6] These witnesses were presumably referred to as confession witnesses because they were intended to testify to Mr. Guandique's confession. At trial, only Mr. Morales testified that Mr. Guandique confessed to the killing of Ms. Levy.

explain why it cannot or under what conditions it proposes to disclose the information." A few weeks later, on July 16, 2010, the trial court ordered that no later than two weeks prior to trial, the government was to disclose impeachment information, including prior convictions, materially inconsistent statements, and issues concerning capacity (the *Giglio* letter).[7]

On September 21, 2010, Mr. Campoamor-Sánchez emailed Ms. Haines a first draft of the *Giglio* letter discussing information related to the government's five incarcerated witnesses, including Mr. Morales. The draft disclosed Mr. Morales's prior convictions but did not disclose his prior debrief with law enforcement. The next day, Mr. Campoamor-Sánchez sent Ms. Haines an updated draft of the *Giglio* letter that added the identity of three further witnesses and a passage indicating Mr. Morales did not have mental health issues. This second draft did not mention Mr. Morales's prior debrief.

The day that Mr. Campoamor-Sánchez sent the second draft, Ms. Haines assumed responsibility for finalizing and sending the *Giglio* letter. In so doing,

---

[7] So-called *Giglio* information includes evidence that could be used to impeach the credibility of a government witness because such evidence is exculpatory or has the potential to be exculpatory. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (holding due process required disclosure of evidence of alleged promise by government to not prosecute witness in exchange for testimony as it was "relevant to [the witness's] credibility and the jury was entitled to know of it").

Ms. Haines indicated that Mr. Campoamor-Sánchez would not need to work on the *Giglio* letter any further. Afterwards, Ms. Haines revised Mr. Campoamor-Sánchez's draft by adding a statement that Mr. Morales had received no benefit in exchange for testifying. The final draft prepared by Ms. Haines did not disclose Mr. Morales's prior debrief.

The *Giglio* letter was sent to Mr. Guandique's counsel on October 4, 2010. This was the first time that the defense learned of Mr. Morales's identity. From the time that he sent his second draft to Ms. Haines to the time that the *Giglio* letter was submitted to the defense, Mr. Campoamor-Sánchez had no further responsibility for the letter nor input into its drafting or submission.

The day after Ms. Haines submitted the *Giglio* letter, and thirteen days prior to trial, she met with Mr. Morales for the first time to prepare his trial testimony. Ms. Haines asked Mr. Morales whether he had ever testified before, to which he responded, "[n]o." She then asked him whether he had "ever worked with the government or cooperated or done anything like this before." Mr. Morales again indicated that he had not. Ms. Haines confronted Mr. Morales with the Zaldivar letter, noting it said that he had debriefed with law enforcement. Mr. Morales responded, "[t]hat's not—that's not the same thing. That was nothing." He further explained that he had debriefed with a gang unit from California while he was

incarcerated in Atlanta, although he "refused to tell about other people." Ms. Haines then questioned Mr. Morales on how he felt about testifying. Mr. Morales indicated that "[h]e was afraid of the repercussions" because "[b]eing a snitch, testifying is a death sentence." However, Mr. Morales maintained that "he was trying to become a better man," which motivated him to testify. By this point in her trial preparation, Ms. Haines intended to present Mr. Morales's "changed value system" as an explanation for his delay in coming forward with information about Mr. Guandique's confession.

After this initial meeting, Ms. Haines worked with members of the U.S. Attorney's Office to verify details of Mr. Morales's story, including the veracity of his claim that he had not previously requested or received any benefit in exchange for cooperating with law enforcement. According to Ms. Haines, this search did not reveal "anything more . . . to investigate."

Ms. Haines met with Mr. Morales again on October 30, 2010. During this meeting, Mr. Morales reiterated that his earlier debriefing concerned only his own conduct, he had not implicated others, and he did not receive any benefit for cooperating. Ms. Haines later testified that she questioned Mr. Morales about his debriefing because she may need to "take the sting out" of the issue at trial. She "wasn't . . .intending" to ask Mr. Morales about the debriefing at trial, but she "felt

the defense might." At this point, Ms. Haines believed that the Zaldivar letter's reference to a debriefing meant "not much more than it says, that [Mr. Morales] met with law enforcement."

## C.      Mr. Guandique's Trial

Mr. Guandique's trial took place in October and November 2010. The second and third pages of the Zaldivar letter were produced to the defense as Jencks Act material approximately two days prior to Mr. Morales taking the stand.[8] The first page, which was not produced, contained the reference to Mr. Morales's debrief with law enforcement and also provided a brief explanation of how Mr. Zaldivar and Mr. Morales met.

When it came time for Mr. Morales to testify, he said that he "didn't have it in [himself]" to come forward to the authorities in 2006 when Mr. Guandique had confessed to committing the Levy murder. Mr. Morales testified that he did not come forward with the confession sooner because he had "a thug mentality," including the "false philosoph[y] of you don't tell" because "[t]hat's not something

---

[8] Jencks material must be produced no later than after a witness testifies on direct examination. 18 U.S.C. § 3500(b). Such material includes "written statement[s] made by [the] witness and signed or otherwise adopted or approved by him" or "transcription[s]" that are "a substantially verbatim recital of an oral statement made by [the] witness and recorded contemporaneously." *Id.* at § 3500(e)(1)-(2).

you are supposed to do." Mr. Morales explained that, upon transferring to a new facility and entering a skills program, he changed "[d]rastically" and learned "to make better . . . choices." While at this new facility, Mr. Morales received a visit from his family that "gave [him] a lot of confidence." According to Mr. Morales, these circumstances led him to "no longer subscribe to those prison philosophies," which made it easier for him to decide to report Mr. Guandique's confession.

According to Mr. Morales, around the time he had a change in values, he also met Mr. Zaldivar. Mr. Morales testified that Mr. Zaldivar was a mentor figure who helped him decide to come forward with the story that Mr. Guandique had shared in 2006. Mr. Morales testified that he "didn't know how" to come forward with the story and was "nervous" to do so as he had "no trust in law enforcement." Accordingly, Mr. Morales asked Mr. Zaldivar "Do you know what to do?" because Mr. Morales felt that Mr. Zaldivar "knew what to do."

On cross-examination, Mr. Morales testified that he "trusted [Mr. Zaldivar] to know what to do" regarding sharing his story about Mr. Guandique. Mr. Morales also testified that he had never "come forward with respect to anyone other than Mr. Guandique." During Mr. Morales's testimony, the government did not ask him about the debriefing referenced in the Zaldivar letter.

On November 8 and November 14, 2010, during Mr. Guandique's trial, Ms. Haines forwarded internal government emails containing confidential and secret information related to the prosecution of the case to her then-boyfriend. Ms. Haines did not have permission to do so.

Later that month, on November 22, 2010, Mr. Guandique was found guilty of first-degree murder. On February 11, 2011, Mr. Guandique was sentenced to sixty years in prison.

### D.    Post-Trial Developments

In January 2012, Fresno, California police contacted the Department of Justice seeking to interview Mr. Morales about an unsolved murder committed in the 1990s. This led to a post-trial investigation by the U.S. Attorney's Office (the USAO investigation), in which the government determined that, in 1998, Mr. Morales had volunteered to provide Fresno law enforcement with information about two murders. Mr. Morales's cooperation included eight to ten interviews, a written statement about his gang activities, and efforts by his attorney to negotiate a cooperation agreement for Mr. Morales to provide testimony about murders and a police shooting. The investigation also revealed that Mr. Morales had sent a letter to a prosecutor in 1996 claiming that he had previously worked with a local law enforcement entity, and that local law enforcement had approached a federal

prosecutor about the possibility of a sentence reduction for Mr. Morales. It is unclear which of these interactions was the debrief referenced in the Zaldivar letter. However, Mr. Morales testified at trial that he was incarcerated for distribution of methamphetamine and cocaine, in addition to gun crimes.[9]

The USAO investigation determined that Mr. Guandique would be unable to show that the failure to disclose this information to the defense prior to trial constituted a *Brady* violation because the prosecution was not in possession of the information at the time of trial and it was not material to the outcome of the trial. The investigation also concluded that the prosecution team believed the entire Zaldivar letter—including the reference to Mr. Morales's debrief—had been produced to the defense, although there was no written documentation of such disclosure.

On November 13, 2012, Mr. Campoamor-Sánchez reported the revelations about Mr. Morales's past to the trial court, which then ordered disclosure to Mr. Guandique's defense team. Mr. Campoamor-Sánchez submitted the newfound information in a November 21, 2012 letter to Mr. Guandique's attorneys, in which he noted that information about Mr. Morales's debriefing was contained in the

---

[9] During his grand jury testimony, Mr. Morales also indicated that he had previously been convicted of robbery using a firearm, assault with a firearm, and felon in possession of a firearm.

Zaldivar letter "previously provided" to the defense. After reviewing their files, Mr. Guandique's attorneys informed the U.S. Attorney's Office that they did not have a complete copy of the Zaldivar letter. The complete Zaldivar letter was subsequently produced to Mr. Guandique.

Thereafter, Mr. Guandique moved for a new trial—"largely based on [the newfound] information" contained in the Zaldivar letter—arguing that the information should have been disclosed prior to his trial. Following multiple post-conviction hearings, the government withdrew its opposition to the motion. Consequently, the trial court did not rule on whether the government's alleged failure to disclose the entire Zaldivar letter violated *Brady*. The government subsequently moved to dismiss with prejudice the indictment against Mr. Guandique.

After the indictment was dismissed, the Department of Justice's Office of Professional Responsibility (OPR) conducted an investigation into the conduct of Ms. Haines and Mr. Campoamor-Sánchez. According to OPR, "[s]ome evidence supports a conclusion that page one [of the Zaldivar letter] was disclosed; other evidence supports a conclusion that [it] was not disclosed." As a result, OPR could not establish by a preponderance of the evidence that the trial team failed to disclose the entirety of the Zaldivar letter.

### E. Disciplinary Proceedings

Disciplinary Counsel charged Ms. Haines and Mr. Campoamor-Sánchez with failing to produce information that tended to discredit a key government witness in violation of D.C. Rules of Professional Conduct 3.8(e) and 8.4(d). Ms. Haines was also charged with disclosing client confidences in violation of Rule 1.6(a). On February 24, 2022, the Hearing Committee found that Ms. Haines violated Rules 3.8(e), 8.4(d), and 1.6(a), while also recommending that the charges against Mr. Campoamor-Sánchez be dropped. The Hearing Committee recommended that Ms. Haines be suspended from the practice of law for ninety days.

The Board largely adopted the Hearing Committee's findings of fact.[10] The Board determined that Mr. Morales testified so "well" and "credibly" at the Guandique trial that the prosecution "determined they would call none of the other potential, alleged 'confession' witnesses." It found that the government "relied heavily" on Mr. Morales's "conversion narrative to frame and explain" his testimony. It also found that Mr. Guandique's defense counsel "challenged

---

[10] "The Board 'has the power to make its own factual findings' but 'must accept the Hearing Committee's evidentiary findings, including credibility findings, if they are supported by substantial evidence in the record.'" *In re Klayman*, 228 A.3d 713, 717 (D.C. 2020) (quoting *In re Bradley*, 70 A.3d 1189, 1193 (D.C. 2013)). Here, the Board reviewed the Hearing Committee's findings of fact to reach its own findings.

[Mr. ]Morales about his failure to report the confession until after" the television report and "contested [Mr. Morales's] tale of an epiphany." The Board found that the defense was unable to reference the fact of the debrief during this confrontation because "defense counsel did not know about it." The Board further found that Mr. Morales's testimony "was undeniably central" to Mr. Guandique's conviction, meaning the witness's "credibility was crucial to the success of the prosecution." Critically, Mr. Morales's credibility "depended on the believability of his explanation" for the delay in reporting Mr. Guandique's confession. Furthermore, the Board found that Disciplinary Counsel met its burden of establishing that Mr. Guandique's defense did not know about Mr. Morales's debrief at the time of their client's trial. It also found that Ms. Haines should have recognized the fact of the debrief as exculpatory and therefore should have disclosed it, but that there was insufficient evidence to support a finding that she actually did recognize the evidence's exculpatory nature. Finally, the Board recommended that a suspension of sixty days was an appropriate sanction for Ms. Haines.

## II. Discussion

### A. Standard of Review

Disciplinary Counsel bears the burden of proving attorney misconduct by clear and convincing evidence. *In re Lattimer*, 223 A.3d 437, 439 (D.C. 2020). We

accept the Board's findings of fact unless they are unsupported by substantial evidence, and we review questions of law and ultimate fact de novo. *In re Schuman*, 251 A.3d 1044, 1049 (D.C. 2021). A hearing committee's "credibility findings must be accepted and can have a foreclosing impact on ultimate facts and legal conclusions [if] they are supported by substantial evidence and uninfected by legal error." *In re Krame*, 284 A.3d 745, 754-55 (D.C. 2022).

We adopt the sanctions recommendation of the Board unless doing so would foster a tendency toward inconsistent resolution of comparable conduct or is otherwise unwarranted. *In re Kennedy*, 281 A.3d 36, 41 (D.C. 2022); D.C. Bar R. XI § 9(h)(1). "The Board's recommended sanction 'comes before us with a strong presumption in favor of its imposition.'" *In re Tun*, 286 A.3d 538, 543 (D.C. 2022) (quoting *In re McClure*, 144 A.3d 570, 572 (D.C. 2016) (per curiam)). Generally, "if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *In re Baber*, 106 A.3d 1072, 1076 (D.C. 2015) (per curiam). Notwithstanding this deference, the system of attorney discipline—including the imposition of sanctions—is ultimately the responsibility and duty of this court. *In re Haar*, 270 A.3d 286, 294 (D.C. 2022).

## B.     Whether Ms. Haines Violated Rule 3.8

Under the Rules of Professional Conduct in effect at the time of Mr. Guandique's prosecution for the murder of Ms. Levy, a prosecutor in a criminal case shall not

> [i]ntentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense . . . except when the prosecutor is relieved of this responsibility by a protective order of the tribunal[.]

D.C. R. Pro. Conduct 3.8(e).[11]   A Rule 3.8(e) violation requires (1) evidence or information that is exculpatory; (2) the prosecutor's awareness of this information

---

[11] As previously discussed, effective May 6, 2025, the text of Rule 3.8(e) was amended, and the provision was redesignated as Rule 3.8(d).  *See* D.C. R. Pro. Conduct 3.8(d).  Under the amended rule, a prosecutor shall not

> [i]ntentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information, which can include impeachment information or information tending to support a motion to suppress evidence, that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense, or in connection with sentencing, intentionally fail to disclose to the defense any unprivileged mitigating information known to the prosecutor and not reasonably available to the defense, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal[.]

and either (a) their knowledge that it is exculpatory or (b) the information is such that a reasonable prosecutor would know that it was exculpatory; and (3) the prosecutor's intentional failure to disclose the information to the defense. *In re Dobbie*, 305 A.3d 780, 793 (D.C. 2023). We have previously cited the ABA Standards for Criminal Justice when analyzing the scope of Rule 3.8(e). *See Kline*, 113 A.3d at 207-08 (indicating the Standards "provide some guidance . . . for determining what material must be disclosed"). The Standards "'adopt[] the definition of exculpatory material contained in the Supreme Court's decision in *Brady v. Maryland*, [373 U.S. 83 (1963),] that is, material that tends to negate guilt or reduce punishment.'" *Kline*, 113 A.3d at 208 (quoting ABA STANDARDS FOR CRIMINAL JUSTICE: THE PROSECUTION FUNCTION § 3-3.11 (2d ed. 1986)).

Under *Brady*, as clarified by *Giglio v. United States*, 405 U.S. 150 (1972), "prosecutors must disclose to the defense material information that impeaches the prosecution's witnesses." *Dobbie*, 305 A.3d at 799; *see also Giglio*, 405 U.S. at 154 ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" justifies a new trial. (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959))). "Rule 3.8(e) incorporates

---

*Id.* The amended text is in line with our precedent regarding the now-defunct version of Rule 3.8(e). Accordingly, the amended rule does not impact our analysis in this case. In any event, Ms. Haines and Mr. Campoamor-Sánchez were charged under the old Rule 3.8(e). We must therefore assess their culpability under that provision.

that principle . . . ." *Dobbie*, 305 A.3d at 799. Accordingly, impeachment evidence "'is exculpatory and thus can be material to guilt or punishment,'" *Bennett v. United States*, 797 A.2d 1251, 1256 (D.C. 2002) (quoting *Lewis v. United States*, 408 A.2d 303, 307 (D.C. 1979)), although such information need not be material to trigger Rule 3.8(e). *See Kline*, 113 A.3d at 213 ("Rule 3.8(e) requires a prosecutor to disclose all potentially exculpatory information . . . regardless of whether that information would meet the materiality requirements of [*United States v. Bagley*, 473 U.S. 667 (1985)] and [its] progeny.").

The knowledge requirement of Rule 3.8(e) may be triggered by "two mutually exclusive possibilities": (1) a prosecutor either knows, or (2) unreasonably lacks knowledge, that the information is exculpatory. *Dobbie*, 305 A.3d at 793.

Concerning intent, the rule "requires an element of purposefulness or deliberateness or, at a minimum, of aggravated neglect." *Kline*, 113 A.3d at 213. "[T]o violate the rule, a prosecutor must act or fail to act with the purpose that information not be disclosed." *Dobbie*, 305 A.3d at 793. The intentionality requirement is limited to the discrete act of nondisclosure of the information; the requirement does not concern any intent to deprive the defendant of the information. *See id.* at 794-96 (rejecting argument that "the prosecutor must intend the forbidden

result, so her intentionality must extend not only to the nondisclosure, but also to the nature of the information"). The "'entire mosaic'" of conduct should be considered when assessing intent. *Kline*, 113 A.3d at 213 (quoting *In re Ukwu*, 926 A.2d 1106, 1117 (D.C. 2007)). Nondisclosure caused by "a genuine accident" does not trigger Rule 3.8(e) because the "failure of disclosure was not intentional." *Dobbie*, 305 A.3d at 794; *see id.* (suggesting if an attorney knew information was exculpatory and attempted to share it with opposing counsel but failed to do so due to a genuine accident, then Rule 3.8(e) was not violated as the failure to disclose was not intentional).

### 1. Whether the fact of Mr. Morales's debrief was exculpatory

If the fact of Mr. Morales's debrief was not exculpatory, then Ms. Haines could not have violated Rule 3.8(e). Ms. Haines argues that the debrief was not exculpatory evidence. We disagree.

Under *Giglio*'s clarification of *Brady*, prosecutors are obliged to disclose "information that impeaches the prosecution's witnesses." *Dobbie*, 305 A.3d at 799. The fact of the debrief is impeachment information as it contradicts Mr. Morales's testimony. The story Mr. Morales told on the stand was, in short, that he reformed and determined that he could cooperate with the authorities despite the risk of being outed as an informant. The fact of the debrief contradicts this narrative in two ways.

First, Mr. Morales testified that he "didn't know how" to come forward with the story Mr. Guandique told him, so he asked Mr. Zaldivar "Do you know what to do?" because Mr. Morales felt that Mr. Zaldivar "knew what to do." If Mr. Morales had previously debriefed with the authorities—regardless of the scope of that interaction—he manifestly knew how to engage with law enforcement. Accordingly, the fact of the debrief contradicts Mr. Morales's testimony that he did not know how to come forward with Mr. Guandique's revelation. Second, the existence of the debrief contradicts Mr. Morales's asserted reform from his old "thug mentality," which included the "false philosoph[y] of you don't tell." This is because the fact of the debrief illustrates that Mr. Morales had previously come forward and cooperated with the authorities, be that about his own conduct or the conduct of others. Either type of cooperation would surely be counter to the "false philosoph[y]" Mr. Morales testified that he previously ascribed to as either type of cooperation would risk being labeled an informant.[12] Finally, Mr. Morales's debrief also contradicted his testimony that he had never "come forward with respect to

---

[12] Ms. Haines appeared to understand the significance of Mr. Morales's purported "thug mentality." When she testified before the Hearing Committee, she indicated that she believed Mr. Morales's explanation of the debrief "[b]ecause he told us he had not come forward, he had not been a snitch. He still had this thug mentality that you shouldn't tell, shouldn't testify, shouldn't cooperate."

anyone other than Mr. Guandique." In short, the existence of Mr. Morales's prior debriefing was substantively inconsistent with the story he presented to the jury.

Accordingly, the fact of the debrief is exculpatory impeachment evidence; it is evidence sufficient to satisfy the first element of the Rule 3.8(e) test.

## 2. Whether Ms. Haines knew the fact of the debrief was exculpatory

The Board found that the record is devoid of clear and convincing evidence that Ms. Haines actually understood the exculpatory nature of the debrief. This determination differs from that of the Hearing Committee, which found there was "ample evidence" that Ms. Haines "actually knew that the Morales debriefing tended to negate Guandique's guilt."

The Hearing Committee found Ms. Haines's efforts to "take the sting out" of the fact of the debrief evidenced her knowledge that this information could be used to undercut Mr. Morales's credibility. Indeed, Ms. Haines admitted before the Hearing Committee that she questioned Mr. Morales about the debrief prior to trial as she was concerned defense counsel would do the same during Mr. Morales's testimony. This fact manifestly illustrates Ms. Haines's awareness that the fact of the debrief had impeachment value. However, there is substantial evidence that Ms. Haines did not know impeachment evidence constituted exculpatory

information. To wit, the Hearing Committee found that Ms. Haines "viewed 'impeachment' and 'exculpatory' information as subject to different disclosure requirements." The Board did not reject this finding, but it did assess whether Ms. Haines's view of the law impacted her actual knowledge of whether the information was exculpatory. We agree that this additional analysis is necessary.

The Board found that Ms. Haines did not understand "that the evidence to be evaluated for purposes of determining whether it tended to negate [Mr. Guandique's] guilt . . . was the statement in the Zaldivar letter . . . that [Mr. Morales] had previously 'debriefed to law enforcement about his gang involvement.'" The Board clarified that Ms. Haines should have understood the significance of this evidence "without any potential later explanation or embellishment by [Mr. Morales], but viewed in the context of [his] anticipated testimony at trial regarding his change of heart." Furthermore, Disciplinary Counsel did not rebut Ms. Haines's testimony that "she subjectively believed she did not have to turn [information concerning the debrief] over." Accordingly, there is substantial evidence that Ms. Haines did not subjectively know the fact of the debrief was exculpatory.

### 3. Whether a reasonable prosecutor would have known the debrief was exculpatory

As noted above, at the time the *Giglio* letter was submitted, the law clearly provided that impeachment evidence was subject to disclosure under *Brady*. *See*

*Bennett*, 797 A.2d at 1256 (indicating impeachment evidence is material to guilt under *Brady*). For purposes of *violating* Rule 3.8(e), it is of no consequence whether this impeachment information was material to the outcome of Mr. Guandique's trial. *Kline*, 113 A.3d at 213. However, as the conduct at issue in this case occurred prior to the case in which we announced that Rule 3.8(e) applies regardless of materiality, we assess the materiality of the fact of the debrief to determine whether a reasonable prosecutor would have known that information was exculpatory under *Brady*/*Giglio* and thus subject to disclosure.[13]

Under *Brady* and its progeny, evidence is material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Andrews v. United States*, 179 A.3d 279, 287 (D.C. 2018) (quoting *Miller v. United States*, 14 A.3d 1094, 1115 (D.C. 2011)). A "'reasonable probability'" is "'a probability sufficient to undermine confidence in the outcome.'" *Mackabee v. United States*, 29 A.3d 952, 959 (D.C. 2011) (quoting *Bagley*, 473 U.S. at 682). "'The question is not whether the defendant would more

---

[13] Ms. Haines's conduct occurred prior to *Kline*, the case in which we first held that Rule 3.8(e) requires disclosure of exculpatory information regardless of whether it was material. 113 A.3d at 213. Consequently, the Board determined that it needed to "determine whether the failure to timely disclose the evidence of [Mr. Morales's] debriefing was material" in order to assess the appropriate sanction. We agree that the materiality inquiry is relevant in this case as it occurred prior to *Kline*.

likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Miller*, 14 A.3d at 1115 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). In other words, there does not need to be a showing that it is more likely than not the defendant would have been acquitted; instead, we probe "whether the defendant received a fair trial and our 'confidence' in the outcome of the trial" has been undermined. *Vaughn v. United States*, 93 A.3d 1237, 1262 (D.C. 2014) (quoting *Kyles*, 514 U.S. at 434). This is not a sufficiency of the evidence test. *Andrews*, 179 A.3d at 287 (citing *Kyles*, 514 U.S. at 434).

Here, Mr. Morales was the sole witness to testify that Mr. Guandique confessed to the killing of Ms. Levy. "'[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *McCoy v. United States*, 890 A.2d 204, 211 (D.C. 2006) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)). Consequently, Mr. Morales's testimony regarding Mr. Guandique's confession was critical to the outcome of the trial. As the only witness directly tying Mr. Guandique to the Levy murder, it is unsurprising that—in the words of Mr. Campoamor-Sánchez—in a courtroom "packed full of people . . . you could hear a pin drop" during Mr. Morales's testimony. It follows that Mr. Morales's credibility carried immense weight in balancing the scales of justice. In closing and rebuttal closing, Ms. Haines emphasized that Mr. Morales

was a man whom "the system has actually affected," causing a "change of heart" and "redemption" after which he was "just trying to do something good" with no "ulterior motive." In closing, the defense told the jury that the case "essentially rises or falls on whether you can believe Armando Morales beyond a reasonable doubt."

Put plainly, Mr. Morales's testimony was the fulcrum of the trial, and his credibility was a highly contested issue on which the value of that testimony turned. Potentially the largest problem that Mr. Morales posed as a witness was his three-year delay in coming forward to report Mr. Guandique's confession. Mr. Morales's explanation that he had never come forward in this manner due to his "thug mentality" and did not know how to do so provided the government with a useful riposte to their witness's weakness. The government built up Mr. Morales's credibility around this narrative of his unselfish redemption. The revelation of the debrief would have enabled the defense to undermine Mr. Morales's "conversion" narrative and cast doubt on the motivation for his delay in coming forward, therefore undermining the credibility of his report of Mr. Guandique's confession.

Additionally, the debrief would show that Mr. Morales did, in fact, "know how" to come forward with Mr. Zaldivar's story because he had previously cooperated with the authorities. The fact of the debrief also contradicted Mr. Morales's purported adherence to a "thug mentality" as it demonstrated

cooperation with law enforcement in contravention of the "false philosoph[y] of you don't tell." This contradiction is even more important as the prosecution presented Mr. Morales as a redeemed criminal. If the source of his redemption—a newfound embrace of cooperation—was revealed to be overstated, Mr. Morales's credibility would suffer. Finally, the debrief contradicted Mr. Morales's testimony that he had not come forward concerning anyone other than Mr. Guandique as he had come forward about himself. For these reasons, it is reasonably probable that the fact Mr. Morales debriefed with law enforcement may have vitiated his credibility with the jury. The fact of the debrief was thus material and unquestionably subject to disclosure under *Brady/Giglio*.

Nevertheless, Ms. Haines did not believe the fact of the debrief needed to be disclosed because she investigated the debrief herself by verifying certain details and discussing the debrief with Mr. Morales. Through work with members of the U.S. Attorney's Office, Ms. Haines verified when Mr. Morales was incarcerated in Atlanta. Ms. Haines also reviewed case records to determine whether Mr. Morales had previously received benefit in exchange for cooperating with law enforcement, but these efforts were, in Ms. Haines's words, "a dead end." Finally, Ms. Haines confronted Mr. Morales about the debrief, which he dismissed as "nothing." Ms. Haines mistakenly credited Mr. Morales's explanation and concluded that she did not need to disclose the fact of the debrief to Mr. Guandique's defense. As the

Board found, while Ms. Haines's investigation was entirely appropriate, the information she learned and the way she assessed it was insufficient to justify withholding the evidence under *Brady*, *Giglio*, and Rule 3.8(e).

Beyond this, Assistant U.S. Attorneys were trained to err on the side of providing *potentially* exculpatory evidence, including potential impeachment evidence.[14] And just two months before Mr. Guandique's trial, this court issued a decision in *Zanders*. There, we held the following:

> [T]he guiding principle must be that the critical task of evaluating the usefulness and exculpatory value of the information is a matter primarily for defense counsel, who has a different perspective and interest than the police or prosecutor. . . . It is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited at trial, or ultimately rejected by the fact finder.

*Zanders v. United States*, 999 A.2d 149, 164 (D.C. 2010). A reasonable prosecutor—drawing upon both longstanding and recent precedent, as well as on-

---

[14] Mary McCord, a former Assistant U.S. Attorney, testified on behalf of Mr. Campoamor-Sánchez that "Department of Justice policy is also to provide more exculpatory and impeaching information to the defense than what the Constitution requires." Ms. McCord held various supervisory positions at times relevant to this case, including serving as Deputy Chief of the Sex Offense and Domestic Violence Section "around 2006," then Deputy Chief of the Appellate Division until "early 2012," at which point she became Chief of the Criminal Division until 2014.

the-job training—would thus know the fact of Mr. Morales's debrief was exculpatory.

Ms. Haines counters that we need not hypothesize about what a reasonable prosecutor would have known, as we may instead look to at least three instances of actual prosecutors determining the information was not exculpatory. First, she argues that none of the other members of the Guandique trial team thought the debrief was exculpatory. We are unpersuaded by this argument. The trial team was led by Ms. Haines, meaning she bore ultimate responsibility for determining whether the information was exculpatory.

Second, Ms. Haines describes a training where she asked a deputy chief in her office whether a "debriefing that went nowhere" carried out by a cooperator should be disclosed. The deputy chief said that it need not be disclosed. This court declines to hold that a response to a hypothetical situation presented in training and devoid of any context is sufficient to override concrete facts in the record.

Finally, Ms. Haines contends that OPR—"the proverbial 'reasonable prosecutor'"—did not find the debrief exculpatory. This is true but represents only part of OPR's findings; in fact, OPR made no explicit conclusion on the exculpatory value of the information. Notwithstanding its explicit findings, OPR's report indicates that Ms. Haines did not violate any duties when she failed to "disclose that

Morales told her that when he debriefed with law enforcement, he 'told them everything.'" The investigators found that this statement was inconsistent with Mr. Morales's statement "that he never named names." OPR further found that, if the first page of the Zaldivar letter had been disclosed, the defense would have known of the debrief, which "would have mitigated any prejudice resulting from the decision not to disclose" Mr. Morales's inconsistent statement. It would be inappropriate to interpret these determinations as a concrete conclusion that the debrief was (or was not) exculpatory.

Ms. Haines's citation to the *Kline* court's observation that it was "instructive that all of the prosecutors who later became aware of [the information at issue] recognized that the statement was potentially exculpatory," *Kline*, 113 A.3d at 211, is unpersuasive. Ms. Haines contends that "[t]his case is the flip side of *Kline*" and that we should find it "significant" that none of the aforementioned prosecutors recognized the debrief as exculpatory. This is not so. The acknowledgement by prosecutors familiar with the specific context of *Kline* that the information in that case was exculpatory is substantively different than the conclusions Ms. Haines relies upon here. *See id.* at 205-06 (indicating prosecutors who led the case giving rise to *Kline* or specifically testified to United States Attorney's Office training practices at the disciplinary hearing in that case believed the evidence at issue to be potentially exculpatory). The prosecutors Ms. Haines points to became acquainted

with the exculpatory information in varied contexts and reached different conclusions. We therefore reject this argument.

In sum, the views of the three sets of prosecutors proffered by Ms. Haines do not mitigate our conclusion that a reasonable prosecutor would have known the fact of the debrief was exculpatory.

### 4. Whether Ms. Haines intentionally failed to disclose the fact of the debrief

There is no dispute that the first page of the Zaldivar letter was not disclosed in the *Giglio* letter.[15] Nor is there any dispute that Ms. Haines was solely responsible

---

[15] Indeed, there is no dispute that the Zaldivar letter was not disclosed to defense counsel prior to the start of trial. Furthermore, two defense attorneys testified that the first page of the Zaldivar letter was not produced as Jencks material. The Hearing Committee found that this testimony was delivered "clearly, unhesitatingly and from first-hand knowledge that the first page of the Zaldivar letter was not given to" the defense as Jencks material. The Hearing Committee further found that "[t]heir testimony was unshaken on cross-examination." These findings are grounded in credibility determinations and therefore must be deferred to. *See In re Tun*, 195 A.3d 65, 72-73 (D.C. 2018) ("'[W]e are required to defer to Hearing Committee credibility findings if they are supported by substantial evidence on the record.'" (alteration in original) (quoting *In re Pye*, 57 A.3d 960, 973 (D.C. 2012))). This evidence is supported by a post-trial search of PDS files which "confirmed" that the first page was not among the Jencks material.

Assistant U.S. Attorney Chris Kavanaugh—who was responsible for producing the Jencks material but otherwise did not have responsibility over aspects of litigation relevant to this appeal—testified that he could not say with certainty whether the first page had been part of the Jencks production. The Hearing Committee found Mr. Kavanaugh's testimony "sincere" but "mistaken" and marred by "hazy" recollections. Again, these are credibility determinations that are entitled

for the final draft of that letter. The letter was sent to Mr. Guandique's counsel on October 4, 2010, a day prior to Ms. Haines's first interview with Mr. Morales. During that interview and in a second on October 30, 2010, Ms. Haines confronted Mr. Morales about the debrief. In both interviews, Mr. Morales downplayed the significance of the debrief, dismissing it as "nothing." Thereafter, Ms. Haines relied upon Mr. Morales's explanation of the debrief and opted to not supplement the *Giglio* letter.

In *Kline*, the respondent failed to subjectively recognize that a victim's statement that he lacked knowledge concerning who shot him was exculpatory and determined that the statement need not be produced. *Kline*, 113 A.3d at 204-05, 214. We held that such withholding was made with "deliberateness" sufficient to produce a firm belief that the respondent "intentionally withheld the statement because he did not think it was exculpatory." *Id.* at 214. This holding was bolstered in *Dobbie*, where we explained via hypothetical that a prosecutor who failed to disclose information she reasonably should have known was exculpatory—even though she did not subjectively know it was exculpatory—has acted with intent sufficient to

---

to our deference. *Id.* While both Ms. Haines and Mr. Campoamor-Sánchez testified that they "thought the first page of the [Zaldivar] letter was in the [Jencks] packet, neither had any direct knowledge of that fact." In any event, the charged violations are in connection to disclosure of the information as *Giglio* material, not as Jencks material. Even if disclosure occurred at the latter juncture, that fact would not vitiate culpability.

violate Rule 3.8(e). *See Dobbie*, 305 A.3d at 794 (indicating prosecutor who decides to withhold information she reasonably should know is exculpatory "has intentionally failed to disclose exculpatory information"). Ms. Haines's conduct mirrors that of the respondent in *Kline* and the hypothetical prosecutor in *Dobbie* as she failed to recognize the fact of the debrief as exculpatory and declined to include it in the *Giglio* letter. The "purposeful and deliberate act" to withhold the fact of the debrief was a "conscious[] deci[sion]" by Ms. Haines. *Id.* at 794 (alteration in original) (quoting *Kline*, 113 A.3d at 213-14). Accordingly, we agree with the Board's finding that Ms. Haines consciously decided not to produce the first page of the Zaldivar letter in the *Giglio* letter. Ms. Haines therefore acted with the requisite intent to violate Rule 3.8(e).

Ms. Haines points out that the Board found that there was insufficient evidence to prove that she intentionally failed to disclose the page as Jencks material. It is true that the Board found that there was insufficient evidence to demonstrate that page one's omission from the Jencks packet was intentional. Nonetheless, this conclusion has no bearing on whether the failure to disclose page one in the *Giglio* letter was intentional as these are two separate points in time: the *Giglio* letter was prior to trial and the Jencks disclosure was during trial but immediately prior to Mr. Morales's testimony.

Ms. Haines also argues that her team produced "an unprecedented amount of discovery" that included "information that was truly damaging to the government's case." Ms. Haines also cites to various efforts to uncover details about Mr. Morales's history of government cooperation and confirm the veracity of his story as evidence that she "was trying to find—not bury—evidence that impeached Morales'[s] testimony." She argues that this conduct, placed together into a unified "mosaic," shows that it is implausible she would intentionally withhold page one of the Zaldivar letter.

We acknowledge that Ms. Haines showed diligent efforts to disclose other information.[16] We further acknowledge that there is no evidence of malicious intent behind the failure to disclose the first page of the Zaldivar letter. Nevertheless, in describing this mosaic of conduct, Ms. Haines fails to rebut the simple—and dispositive—fact that the debrief was not disclosed in the *Giglio* letter. The record evidence shows that Ms. Haines did not believe the fact of the debrief had to be disclosed as exculpatory and that nondisclosure thus was not a mistake, but rather an intentional act taken by Ms. Haines. Accordingly, Ms. Haines had the requisite intent to withhold the fact of the debrief.

---

[16] Neither the Board nor the Hearing Committee engage with this argument in their respective reports.

For the foregoing reasons, we hold that Ms. Haines violated Rule 3.8(e).

### C.    Whether Ms. Haines Violated Rule 8.4(d)

Rule 8.4(d) dictates that it is professional misconduct for an attorney to "[e]ngage in conduct that seriously interferes with the administration of justice." D.C. R. Pro. Conduct 8.4(d).  To establish such a violation, there must be clear and convincing evidence that (1) the attorney's conduct was improper; (2) the conduct itself bore directly upon the judicial process with respect to an identifiable case; and (3) the conduct tainted the judicial process in more than a de minimis way.  *In re Hopkins*, 677 A.2d 55, 60-61 (D.C. 1996).  For the conduct to be improper, the attorney "must either take improper action or fail to take action when, under the circumstances, he or she should act." *Id.* at 61.  Misconduct is sufficient to taint the judicial process if it "at least potentially impact[s] the process to a serious and adverse degree." *Id.*

Here, Ms. Haines intentionally failed to disclose the fact of Mr. Morales's debrief, which is improper conduct in violation of both Rule 3.8(e) and *Giglio*.  This misconduct bore heavily upon the judicial process in this case: Mr. Guandique's defense was unable to draw upon material information during cross-examination of the government's key witness.  Finally, the misconduct fundamentally tainted the judicial process.  Absent disclosure, Mr. Guandique was sentenced to sixty years in

prison. After numerous post-conviction hearings that are significantly attributable to Ms. Haines's misconduct, a new trial was granted. This chain of events led to the dismissal of the charges against Mr. Guandique before a second trial could be held.

Ms. Haines's conduct is similar to that in other cases where we held attorneys violated Rule 8.4(d). *See, e.g.*, *Dobbie*, 305 A.3d at 780 (respondent's *Brady* violation "resulted in a substantial and avoidable use of judicial time and resources, ultimately resulting in the vacatur of a criminal conviction"); *In re Cole*, 967 A.2d 1264 (D.C. 2009) (misconduct led to "'unnecessary expenditure of time and resources'" by tribunal "'to try to rectify the situation'" created by respondent (quoting record)); *In re Spikes*, 881 A.2d 1118 (D.C. 2005) (frivolous actions "'waste[d] the time and resources of this court'" and "'cause[d] appellees unwarranted delay and added expense'" (quoting *Slater v. Biehl*, 793 A.2d 1268, 1277 (D.C. 2002)). Accordingly, Ms. Haines's conduct seriously interfered with the judicial process in violation of Rule 8.4(d).

Ms. Haines offers several arguments against this conclusion. Ms. Haines contends that "[c]ourts exist to hold hearings" and thus the post-conviction proceedings did not seriously interfere with the judicial process. In making this argument, however, Ms. Haines fails to reckon with the significant ramifications of her misconduct described above: Mr. Guandique served significant time for charges

that were ultimately dropped in large part due to her misconduct. This is a serious outcome whether Mr. Guandique was guilty or innocent. If he did commit the crime, he was able to walk free because of the misconduct; if he was innocent, he served years in prison for a crime he did not commit.

Ms. Haines's argument that for conduct to violate Rule 8.4(d), the offending attorney must consciously or intentionally interfere with the administration of justice is similarly unavailing[17]. Neither of the cases that she cites in support of that contention impose such a requirement to support a violation of Rule 8.4(d). The first case Ms. Haines cites, *In re Hallmark*, 831 A.2d 366 (D.C. 2003), contrasts conduct that impacts the judicial proceedings with those which are merely incidental to such proceedings. Specifically, the *Hallmark* court concluded that an attorney's untimely filing of a reimbursement voucher containing erroneous content was negligent and did not violate Rule 8.4(d). *Id.* at 368-69, 374-75. In reaching this conclusion, the *Hallmark* court assessed that this conduct was less egregious than conduct that violated Rule 8.4(d), including, inter alia, deliberate and wrongful refusal to file an appeal and submission of fabricated evidence. *Id.* at 374-75. It is true, as Ms. Haines points out, that the *Hallmark* court characterized these situations as exhibiting

---

[17] We understand Ms. Haines's argument to be that the offending attorney must consciously or intentionally set out to interfere with the administration of justice to violate Rule 8.4(d), not that the conduct that interfered with the administration of justice was conscious or intentional.

"intentional disregard for the effect that an action may have *on judicial proceedings*." *Id.* at 375 (emphasis added). The court also emphasized that the deficient voucher "placed an unnecessary burden on the *administrative processes of the Superior Court*," but did not "seriously and adversely affect the *administration of justice*." *Id.* at 375 (emphasis added). Contrary to Ms. Haines's position, the *Hallmark* court was focused on what aspect of the judicial process was impacted by conduct, not whether any such impact was intentional. Ms. Haines withholding material information directly impacted the judicial process itself, not a derivative administrative function of the judiciary.

The second case Ms. Haines cites, *In re Owusu*, merely quotes the relevant portion from *Hallmark* and thus does not impose an intentionality requirement. *See In re Owusu*, 886 A.2d 536, 542-43 (D.C. 2005) (quoting language from *Hallmark* contrasting intentional conduct from negligent conduct in the context of Rule 8.4(d)). Our caselaw thus makes clear that Rule 8.4(d) does not contain an intentionality requirement. Ms. Haines also argues that it is relevant that there was no finding that she "engage[d] in conduct involving dishonesty, fraud, deceit, or misrepresentation." The lack of such a finding, however, is entirely irrelevant: such a finding is required to sustain a violation of Rule 8.4(c), not Rule 8.4(d). *See* D.C. R. Pro. Conduct 8.4(c).

For the foregoing reasons, we hold that Ms. Haines violated Rule 8.4(d).

## D.    Sanctions for Ms. Haines

### 1.    Sanctions factors

"'In all cases, our purpose in imposing discipline is to serve the public and professional interests . . . rather than to visit punishment upon an attorney.'" *In re Hutchinson*, 534 A.2d 919, 924 (D.C. 1987) (en banc) (quoting *In re Reback*, 513 A.2d 226, 231 (D.C. 1986) (en banc)).  Furthermore, the sanction must not foster a tendency toward inconsistent dispositions for comparable conduct.  *See In re Nwadike*, 905 A.2d 221, 229 (D.C. 2006).  In determining the appropriate sanction, we consider seven non-exhaustive factors: (1) the seriousness of the conduct; (2) the prejudice, if any, to the client; (3) whether the conduct involved dishonesty; (4) whether the attorney violated other disciplinary rules;[18] (5) the attorney's disciplinary history; (6) whether the attorney acknowledged her wrongful conduct; and (7) any mitigating circumstances.  *Dobbie*, 305 A.3d at 811.

As discussed above, we hold that Ms. Haines violated Rules 3.8(e) and 8.4(d).  In addition to these violations, Ms. Haines concedes that she violated Rule 1.6(a) by

---

[18] Under this prong, we "consider[] how many rules were violated." *Dobbie*, 305 A.3d at 812.

forwarding internal prosecution emails containing confidential information to her then-boyfriend.[19]  She accepts responsibility for this violation.

1.      *The nature and seriousness of the misconduct*: "We are obligated to take *Brady* violations particularly seriously not only due to their devastating potential consequences in any given case, but also because *Brady* violations are both common and difficult to detect." *Dobbie*, 305 A.3d at 811.  Here, Ms. Haines failed to disclose information that she should have known was material impeachment evidence, leading to significant post-conviction proceedings, a new trial, and, ultimately, the charges against Mr. Guandique being dropped.  *See* D.C. R. Pro. Conduct 3.8(e), 8.4(d).  She also disclosed confidential information during trial, the point in time when such information is most sensitive.  *See id.* at 1.6(a).  Ms. Haines's misconduct was unquestionably serious.  This factor weighs in favor of sanction.

2.      *Prejudice to the client*: "Any action by a prosecutor that erodes the public's trust in the criminal justice system's ability to correctly mete out justice

---

[19] Rule 1.6(a) provides that attorneys shall not knowingly "reveal a confidence or secret of the lawyer's client."  D.C. R. Pro. Conduct 1.6(a)(1).  "Confidence" refers to information protected by attorney-client privilege while "secret" refers to "other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client."  *Id.* at 1.6(b).

is . . . prejudicial." *Dobbie*, 305 A.3d at 811. By withholding exculpatory information, Ms. Haines undermined the credibility of law enforcement and damaged the reputation of her office. Furthermore, Ms. Haines's conduct was a disservice to her client, which is to say the general public. ABA Standards for Criminal Justice, Prosecutorial Investigations, Standard 1.2(b) (Am. Bar Ass'n 3d ed. 2014). Her conduct led to post-conviction proceedings that resulted in avoidable expenditure of public funds and judicial and law enforcement resources and impugned the reputation of the criminal justice system. This factor weighs in favor of sanction. *See Dobbie*, 305 A.3d at 811 ("Respondents' conduct, which cast doubt on the reliability of [the criminal justice] system, thus weighs in favor of a harsher sanction.").

3. *The presence of misrepresentation or dishonesty*: The Board found that Ms. Haines did not engage in dishonesty. As discussed above, we defer to this finding. Accordingly, this factor weighs against sanction.

4. *Violation of other disciplinary rules*: Ms. Haines violated three rules, Rules 1.6(a), 3.8(e), and 8.4(d). However, the violations of Rules 3.8(e) and 8.4(d) arose from the same conduct (i.e., the failure to disclose the fact of Mr. Morales's debrief). We therefore hold that this factor weighs in favor of sanction, although not

heavily so. *See id.* at 812 (holding violation of three rules arising "out of essentially the same conduct" caused factor to weigh less heavily in favor of sanction).

5. *Disciplinary history*: Ms. Haines has no prior disciplinary violations. This factor weighs against sanction.

6. *Acknowledgment of Wrongdoing*: Ms. Haines has consistently and clearly accepted responsibility for her violation of Rule 1.6(a). She has not acknowledged that she violated Rules 3.8(e) or 8.4(d). However, "an attorney has a right to defend [her]self and we expect that most lawyers will do so vigorously, to protect their reputation and license to practice law." *In re Yelverton*, 105 A.3d 413, 430 (D.C. 2014). Furthermore, Ms. Haines has maintained that the fact of the debrief was disclosed. Accordingly, this factor weighs slightly in favor of sanction.

7. *Mitigating Circumstances*: Ms. Haines argues that we should consider the negative personal repercussions of this proceeding as mitigating circumstances. Troubles of this nature are not what this factor contemplates. *See, e.g.*, *Dobbie*, 305 A.3d at 812-13 (finding deficient conduct of supervisors to be mitigating circumstance). However, it is appropriate to consider Ms. Haines's lack of dishonesty in this case as a mitigating factor. *See Yelverton*, 105 A.3d at 428 (holding that conduct devoid of "dishonesty towards the court" constituted mitigating factor). This mitigating factor weighs in favor of a less onerous sanction.

## 2. Sanctions in prior cases

There have been four other cases involving Rule 3.8(e) violations before this court. Two of those cases are inapposite.[20] The other two are the aforementioned *Kline* and *Dobbie*.

In *Kline*, the respondent violated Rule 3.8(e), and the Board recommended a thirty-day suspension. *Kline*, 113 A.3d at 215. Our review of cases from other jurisdictions revealed a range of sanctions, from public reprimand to a six-month suspension. *Id.* Although we determined in *Kline* that the recommended thirty-day suspension was appropriate, we ultimately held there that uncertainty at the time of the decision concerning the relationship between the scope of *Brady* and that of Rule 3.8(e) meant it was "not unreasonable" for the respondent to withhold immaterial information. *Id.* at 206-07, 215-16. Accordingly, we imposed no sanction. *Id.* at 216.

In *Dobbie*, the respondent violated Rules 3.8(e), 8.4(c), and 8.4(d), although these violations arose from "essentially the same conduct." *Dobbie*, 305 A.3d at

---

[20] *See In re Howes*, 52 A.3d 1 (D.C. 2012) (case concerning the failure to disclose wrongful distributions of more than $42,000.00 in federal witness vouchers, misconduct with a scope and a scale that is qualitatively different from the misconduct here); *In re Cockburn*, Bar Docket No. 2009-D185 (Ltr. Of Informal Admonition) (case that did not result in a published opinion and thus is not considered at the sanctions stage).

812. The Board recommended a six-month suspension. *Id.* at 814. We concluded that a six-month suspension stayed in favor of a one-year probationary period was warranted, as the length of the suspension reflected the gravity of the violation while the stay acknowledged that the respondents did not "shoulder full responsibility" for the misconduct. *Id.*; *see also id.* at 812-13 (holding "the deficient conduct of respondents' supervisors" constituted mitigating circumstances).

### 3. Sanctions determination

Here, the Board recommends a sixty-day suspension, which is a reduction of the Committee's recommended ninety-day suspension. The Board justified the reduction in part because Ms. Haines did not engage in dishonesty and had a clean disciplinary record. We agree with the Board's assessment that these considerations merit a downward variance from the Committee's recommended sanction.

However, the Board did not reduce Ms. Haines's sanction by a sufficient degree. In considering Ms. Haines's lack of dishonesty and clean disciplinary record, the Board only reduced the Committee's recommended sanction by thirty days. Furthermore, the Board did not consider the fact that Ms. Haines is not charged with failing to disclose other exculpatory information. The Board should have followed the path set by the court in *Dobbie* and stayed the suspension in favor of one year of probation. Of course, Ms. Haines is not absolved of misconduct by

the actions of supervisors as was the case in *Dobbie*. However, her misconduct was the result of a seemingly honest mistake. We do not think it appropriate to suspend a career prosecutor from the practice of law for sixty days for a once-in-a-career lapse in judgment. The imposition of the sixty-day suspension acknowledges the impact Ms. Haines's conduct had on the Levy case, while staying the suspension recognizes Ms. Haines's reduced culpability. We determine that this outcome best serves the purposes of imposing attorney discipline: "to serve the interests of the public and of the profession." *In re Askew*, 225 A.3d 388, 397 (D.C. 2020).

The system of attorney discipline is ultimately the responsibility and duty of this court. *Haar*, 270 A.3d at 294. While the Board carefully considered the conduct of Ms. Haines and assiduously compared it to conduct in similar cases, we cannot endorse a sixty-day suspension. We deviate from the Board's recommendation because the sanction it endorses is too harsh for a good faith, one-time, honest mistake by an otherwise competent prosecutor. We are confident that Ms. Haines will take seriously the weight of her conduct.

Accordingly, Ms. Haines is to be suspended from the practice of law for sixty days, stayed as to all in favor of one year of probation.

**E.     Whether Mr. Campoamor-Sánchez Violated Rules 3.8(e) and 8.4(d)**

Mr. Campoamor-Sánchez is charged with violating Rules 3.8(e) and 8.4(d) for failure to disclose the fact of Mr. Morales's debrief.  The Board adopted the recommendation of the Hearing Committee, which recommended dismissal of these charges on grounds that Ms. Haines relieved Mr. Campoamor-Sánchez of all responsibility for the *Giglio* disclosure.  We adopt this recommendation because it is supported by substantial evidence.

The evidence in the record indicates that the day after Mr. Campoamor-Sánchez submitted his first draft of the *Giglio* letter to Ms. Haines, she sent him an email saying "I need to revise [the letter] . . . I'll take care of getting out the [G]iglio letter."  Upon receiving this email, Mr. Campoamor-Sánchez shared his latest draft of the *Giglio* letter.  Thereafter, Mr. Campoamor-Sánchez had no further responsibility for the letter: he made no edits, did not review or approve Ms. Haines's edits, and did not discuss the timing of its submission.  In fact, Mr. Campoamor-Sánchez did not see the final version of the *Giglio* letter until more than a year after the conclusion of Mr. Guandique's trial.

It is true that the two drafts Mr. Campoamor-Sánchez shared with Ms. Haines did not disclose the fact of Mr. Morales's debrief.  However, these draft letters are manifestly just that: drafts.  The documents contain errors, sentence fragments,

notes, and questions that clearly indicate they were not finished work product ready for submission. Furthermore, Ms. Haines explicitly assumed responsibility for making *Giglio* disclosures prior to the court-imposed disclosure deadline. Although Mr. Campoamor-Sánchez cannot be relieved of his *Brady/Giglio* obligations, under these circumstances he reasonably acted in reliance upon Ms. Haines's directives. As Ms. Haines represented that she would make the appropriate *Giglio* disclosures, Mr. Campoamor-Sánchez reasonably relied on Ms. Haines assuming the responsibility for producing exculpatory information. Based on the record of these circumstances, there is substantial evidence that Mr. Campoamor-Sánchez was not in a position to intentionally fail to disclose the fact of the debrief. Accordingly, it would be improper to hold that he violated Rule 3.8(e).

Disciplinary Counsel argues that although the trial court required *Giglio* disclosures to be made no later than two weeks prior to trial, the fact of the debrief should have been disclosed sooner. This assertion rests on Rule 3.8(e)'s directive to produce exculpatory material "at a time when use by the defense is reasonably feasible." Disciplinary Counsel argues that the fact of the debrief was not a "garden-variety" *Giglio* disclosure, but rather one requiring extensive investigation. This contention fails on two grounds.

First, as discussed above, the mere fact of the debrief was exculpatory. While further investigation would have led to additional information that would have significantly increased the debrief's impeachment value, such investigation was not strictly necessary for the fact of the debrief to have exculpatory value. Disclosure of the fact of the debrief would have enabled Mr. Guandique's defense to challenge Mr. Morales's "conversion" narrative generally and to attack his specific assertions that he didn't "know how" to come forward to the authorities and adhered to the "false philosoph[y] of you don't tell."

Second, the government acted in reliance upon the trial court's requirement that impeachment evidence be produced no later than two weeks prior to trial. As the Board found, the trial judge "balanced a number of factors against defense counsel's need" for exculpatory evidence and "set a single firm deadline of two weeks prior to trial for the *Giglio* disclosures."[21] Among these factors was "serious" witness security concerns. This consideration alone is an indisputably legitimate reason to allow disclosure two weeks before trial. *See Zanders*, 999 A.2d at 164 (noting full disclosure should be made "well before the scheduled trial date, unless there is good reason to do otherwise[,] []such as substantiated grounds to fear witness

---

[21] While additional investigation into the debrief would likely have taken longer than the two weeks allotted by the trial court, the trial court presumably considered the general need for investigation into *Giglio* information when setting the production deadline.

intimidation or risk to the safety of witnesses[]").  The government was acting in accord with the court's order.  As such, we decline to penalize Mr. Campoamor-Sánchez for any failure to disclose exculpatory information prior to that deadline.  It would be unreasonable to hold Mr. Campoamor-Sánchez violated the Rules when he acted in accord with instructions from the lead trial attorney, proper court directives, and in the absence of additional misconduct.

In the absence of conduct sufficient to sustain a Rule 3.8(e) violation, there is no basis for holding Mr. Campoamor-Sánchez violated Rule 8.4(d).

Accordingly, we hold that Mr. Campoamor-Sánchez did not violate Rules 3.8(e) or 8.4(d).

### III.   Conclusion

For the foregoing reasons, respondent Amanda Haines is suspended from the practice of law in the District of Columbia for sixty days, stayed as to all in favor of one year of probation.  The period of respondent's probation shall run from the date on which she files the affidavit required by D.C. Bar R. XI, § 14(g).  We direct respondent's attention to the responsibilities of suspended attorneys set forth in D.C. Bar R. XI, §§ 14 and 16.

*So ordered.*